**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO. JKB-20-0269** |
| | * | |
| **JEROLD GILLIAM, et al.** | * | |
| | * | |
| **Defendants.** | * | |
| | ******* | |

**UNITED STATES' CONSOLIDATED RESPONSE**
**IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**

Erek L. Barron
United States Attorney

Charles Austin
Assistant United States Attorney
36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201
410-209-4800
charles.austin@usdoj.gov

November 12, 2021

## TABLE OF CONTENTS

INTRODUCTION AND PROCEDURAL BACKGROUND ...................................................1

STATEMENT OF FACTS .........................................................................3

ARGUMENT .....................................................................................6

 I.  THE MOTIONS TO SUPPRESS INTERCEPTED COMMUNICATIONS SHOULD
BE DENIED BECAUSE THE INTERCEPTION ORDERS COMPLIED WITH THE
FOURTH AMENDMENT AND THE STATUTORY REQUIREMENTS. ...........................6

   A.  **Legal Standard** .....................................................................7

   B.  **Application for Target Telephones 1 and 2 – August 16, 2019.** ...........................12

   C.  **Application for Continued Interception of Target Telephones 1 and 2 –
September 12, 2019.** .......................................................................20

   D.  **Application for Initial Interception of Target Telephones 4 and 5 – September
20, 2019** ...............................................................................22

   E.  **Application for Continued Interception of Target Telephones 4 and 5 – October
18, 2019** ..............................................................................27

   F.  **There Was No Violation of the Wiretap Minimization Requirements.** ...............29

   G.  **The good faith exception applies even if the affidavits are found to be invalid.** ..34

 II.  EACH CHALLENGED SEARCH AND SEIZURE COMPLIED WITH THE
FOURTH AMENDMENT OR WAS OTHERWISE LAWFUL. ...........................................34

   A.  **Legal Standard** ....................................................................35

     1.  Searches pursuant to search warrants. .............................................35

     2.  Searches incident to arrest. .....................................................36

   B.  **The seizures of tangible evidence challenged by the defendants were supported
by probable cause or otherwise lawful.** ..................................................37

     1.  The search warrant for 1946 Walbrook Avenue was supported by
probable cause .........................................................................38

       a.  *The affidavit set forth facts establishing a drug trafficking conspiracy
at least a half dozen participants, and the role of 1946
Walbrook Avenue.* ...................................................................39

       b.  *The 1946 Walbrook Avenue warrant issued based on probable cause and,
in any event, was not so facially invalid as to cause agents to question
its validity.* .....................................................................42

     2.  The search warrant for 409 Millington Avenue was supported by probable
cause .................................................................................44

        c.     *The "Dirty Sprite" affidavit set forth facts establishing a drug trafficking conspiracy, at least a half dozen participants, and the role of 409 Millington Avenue.* ..........................................................................45

        d.     *The 409 Millington Avenue warrant issued based on probable cause.* ...48

   3.   Ross' motion must be denied because he fails to make the showing required by *Delaware v. Franks* to obtain an evidentiary hearing on the veracity of the warrant. ............................................................................................49

        a.     *The defendant fails to show that any of the ample facts relevant to 2415 W. Lexington Street, including location data, are false.* ................................50

        b.     *Ross fails to satisfy either* Franks *prong and, in any event, the 2415 W. Lexington Street warrant issued based on probable cause.* ...................51

   4.   Evidence seized incident to Bond's arrest is lawful and admissible. ..............53

**III.   ROSS' MOTION TO SUPPRESS STATEMENTS SHOULD BE DENIED BECAUSE ALL RELEVANT STATEMENTS WERE POST-*MIRANDA* AND VOLUNTARY** ..........................................................................................**54**

   A. **Legal Standard.** ...................................................................................**54**

   B. **Any statements by Ross occurred subsequent to *Miranda* warnings or were otherwise voluntary and are therefore admissible.** ................................**55**

**IV.   THE MOTION TO SEVER SHOULD BE DENIED BECAUSE MARQUESE WARD IS PROPERLY JOINED WITH THE OTHER DEFENDANTS.** ...........................**58**

   A. **The defendants are properly joined pursuant to Federal Rule of Criminal Procedure 8(b).** ....................................................................................**59**

   B. **Severance is not warranted given the admissibility of evidence against co-defendants in a single trial and the absence of any concrete showing that a co-defendant is willing to offer exculpatory testimony as to Ward.** ...........................**60**

**CONCLUSION** ................................................................................................**63**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. JKB-20-0269** |
| | * | |
| **JEROLD GILLIAM, et al.** | * | |
| | * | |
| **Defendants.** | * | |

\*\*\*\*\*\*\*

**UNITED STATES' CONSOLIDATED RESPONSE**
**IN OPPOSTION TO DEFENDANTS' PRETRIAL MOTIONS**

The United States of America, through its attorneys, Erek L. Barron, United States Attorney for the District of Maryland, and Charles Austin, Assistant United States Attorney for said District, respectfully submits this Consolidated Response in Opposition to pre-trial motions filed by the defendants, specifically, ECF Nos. 179-81 (Conway); 182-84 (Connors); 186-87 (Ward); 188-92 (Bond); and 220-22 (Ross), and states as follows:

**INTRODUCTION AND PROCEDURAL BACKGROUND**

On August 25, 2020, a federal grand jury for the District of Maryland returned an Indictment charging nine individuals with conspiracy to distribute and possess with the intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(vi); 841(b)(1)(B)(i), specifically, 400 grams or more of a mixture of substance containing a detectable amount of fentanyl, a Schedule II controlled substance (Count One). Certain defendants were also charged with additional offenses:

- Jerold Gilliam: possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a) (Count Twelve);

- Akeem Ross: possession with the intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a) (Counts Two, Three, Six, and Eight), possession of a firearm by a

prohibited person, in violation of 18 U.S.C. § 922(g)(1) (Counts Nine and Eleven), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Ten);

- Charles Bond:  possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a) (Count Four);

- Trevor Connors:  possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a) (Count Eight), possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) (Count Nine), and possession of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Ten);

- James Meekins:  possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a) (Count Five);

- Marquese Ward:  possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) (Count Seven).

As of this filing, the following defendants have pled guilty or are scheduled on the Court's calendar to enter such a plea:  Jerold Gilliam and Charles Bond.  The remaining defendants are scheduled to proceed to trial on April 4, 2022.  The Court set a motions hearing for February 14 and 15, 2022.  Several pretrial motions remain outstanding, and many of the pending pretrial motions overlap or address similar issues.  Further, some of the defendants filed motions to adopt the pretrial motions of co-defendants.  Thus, where the relevant facts and legal issues overlap, the government attempts to address those motions together.[1]

---

[1] Charles Bond filed motions to suppress and a motion to adopt motions of other defendants.  ECF Nos. 188-92.  He is currently scheduled to plead guilty in open court on December 3, 2021. Assuming such plea goes through, those motions will be moot.  In any event, this Response

A chart of pending motions filed by each defendant follows:

| Defendant | Motion | ECF No. |
|---|---|---|
| Gilbert Conway | Motion to Adopt Motions Filed by Co-Defendants | 179 |
| | Motion for Leave to File Additional Motions | 180 |
| | Motion to Suppress Title III Wiretap Evidence | 181 |
| Trevor Connors | Motion to Adopt Motions Filed by Co-Defendants | 182 |
| | Motion to Suppress Evidence from Search Warrant | 183 |
| | Motion to Suppress Electronic Surveillance Evidence | 184 |
| Marquese Ward | Motion to Sever | 186 |
| | Motion to Adopt Motions of Other Defendants | 187 |
| Charles Bond | Motion to Suppress Electronic Communications Evidence | 188 |
| | Motion to Suppress Tangible Evidence | 189 |
| | Motion to Suppress Evidence Obtained as a Result of Search Warrant for 409 Millington Avenue | 190 |
| | Motion to Adopt Motion of Other Defendants | 191 |
| | Motion for Leave to File Additional Motions | 192 |
| Akeem Ross | Motion to Adopt Motion of Other Defendants | 220 |
| | Motion to for Franks Hearing | 221 |
| | Motion to Suppress Statements | 222 |

## STATEMENT OF FACTS

The defendants are alleged to be members and/or associates of drug trafficking organizations (DTOs) that operated in the area surrounding the intersection of Pennsylvania and North avenues in Baltimore, Maryland, including the vicinity of the 500 block of Sanford Place and the 500 block of Cumberland Street.  Between July 2019 and December 2019, this organization distributed narcotics, including fentanyl, in Baltimore City.   During their investigation, investigators from Drug Enforcement Administration (DEA) Strike Force Group 1 (SF1) utilized various techniques to identify drug trafficking activity and the participants in the drug trafficking organizations known as "Dirty Sprite" and "Bullseye"—the name of the groups' respective street-level retail products.  Some individuals, including Mr. Bond, were identified as working with both

---

addresses the motions in the event either Mr. Bond opts not to plead or the Court otherwise considers his motions as adopted by others.

groups; others were associated as working with either of the DTOs but not necessarily both. Closed circuit television cameras in the area provided views of the defendants and others participating hand-to-hand transactions, delivering narcotics to organization members and associates for the purpose of facilitating sales to end customers, or otherwise acting in furtherance of the trafficking conspiracies.

On certain dates, law enforcement conducted controlled purchases of narcotics—usually in the form of gelatin capsules ("gelcaps")—from some of the defendants.

- On July 17, 2019, a confidential source purchases gelcaps of heroin from an individual associated at the time with "Dirty Sprite".
- July 24: a confidential source purchases gelcaps of suspected narcotics after Vincent Davis, a member of "Dirty Sprite," authorizes the sale.
- July 30: defendant Charles Bond arranges via telephone the sale of narcotics to a confidential source.
- August 1: an undercover officer purchases narcotics from an individual advertising their sale of "Dirty Sprite" products. Almost an hour later, a Dirty Sprite member sells to another undercover officer ten gelcaps of a mixture containing fentanyl.
- August 6: an undercover officer purchases narcotics from an individual.  The same individual later advised another undercover officer, who was attempting to purchase narcotics, that she had run out of narcotics; a nearby male said that he would advise when "Bullseye" was ready to sell more that day.
- August 28: undercover officers purchase narcotics from a woman who appeared to be the same individual from July 17 and associated with Dirty Sprite.
- September 4: defendant Akeem Ross sells gelcaps containing fentanyl to a confidential source after arranging the sale via a phone call.
- September 5: an undercover officer purchases narcotics from an individual advertising their products as "Bullseye."
- September 10: Ross sells gelcaps of fentanyl to a confidential source, again after arranging the sale via phone.
- September 24: an undercover officer purchases six "trash cans" of suspected cocaine from an individual associated with "Bullseye."
- September 27: an undercover officer purchases six gelcaps from an individual—at one point associate with "Dirty Sprite" but later appearing to work with "Bullseye"—while defendant Isaiah Timms served as a "lookout."

- September 30: defendant James Meekins sells twelve gelcaps of cocaine to an undercover officer.
- October 9: a "Bullseye" associate sells narcotics to an undercover officer.
- October 15: a "Dirty Sprite" member directed the sale of narcotics to an undercover officer.
- October 25: an undercover officer purchases narcotics from an individual who investigators identified as being associated with the DTOs.

Most of these sales occurred in the vicinity of the 500 block of Sanford Place and the 500 block of Cumberland Street, where "Dirty Sprite" and "Bullseye" members were often observed engaging in hand-to-hand transactions.

Pursuant to various court orders, the agents intercepted wire and electronic communications, i.e., phone calls and text messages, of certain individuals associated with "Dirty Sprite" and "Bullseye".

- On August 16, 2019, the Honorable Judge George L. Russell III authorized the interception of (a) wire and electronic communications occurring over the cellular telephone assigned call number 410-339-2735, (Target Telephone 1), a phone used by Wesley Clash; and (b) wire communications occurring over the cellular telephone assigned call number 410-241-2881, (Target Telephone 2), a phone used by Charles Bond.

- On September 12, 2019, Judge Russell authorized the continued interception of wire and electronic communications over Target Telephone 1 and the continued interception wire communications over Target Telephone 2.

- On September 20, 2019, Judge Russell authorized the interception of:

  o wire and electronic communications occurring over the cellular telephone assigned call number 443-985-0936, (Target Telephone 3);

  o wire communications occurring over the cellular telephones assigned call numbers 667-228-7892, bearing IMSI 310260427995557 (Target Telephone 4), a phone subscribed to and used by Akeem Ross, and 410-908-3228, bearing IMSI 312530005887287 (Target Telephone 5), a phone also used by Ross.

- On October 18, 2019, Judge Russell authorized the continued interception of wire and electronic communications occurring over Target Telephone 3 and the

continued interception of wire communications occurring over Target Telephone 4 and Target Telephone 5.

The interception of Target Telephone 1 and Target Telephone 2 ended October 12, 2019. Interceptions of Target Telephone 3, Target Telephone 4, and Target Telephone 5 ceased November 17, 2019.

In October and November 2019, law enforcement officials obtained from this Court search and seizure warrants for various residences and individuals. The execution of these warrants led to the recovery of various mixtures of substances including detectable amounts of fentanyl, drug trafficking paraphernalia, firearms, and other items.

The anticipated evidence arises from various sources, including the seizure of narcotics and narcotics paraphernalia, intercepted communications, physical and electronic surveillance, video surveillance, police reports, laboratory analysis, and numerous witnesses. The evidence supporting the conspiracy count and the individual substantive counts includes evidence of drug and gun seizures on various dates during the investigation. This memorandum will discuss the facts of those episodes in the Argument sections addressing the motions pertaining to those incidents.

## **ARGUMENT**

I. **THE MOTIONS TO SUPPRESS INTERCEPTED COMMUNICATIONS SHOULD BE DENIED BECAUSE THE INTERCEPTION ORDERS COMPLIED WITH THE FOURTH AMENDMENT AND THE STATUTORY REQUIREMENTS.**

Between August and October of 2019, DEA SF1 obtained authorization to intercept certain communications pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), often described as the federal "wiretap" law. As noted above, the authorization orders pertained to phones used by two defendants in this case—Ross and Bond—and other associates and co-conspirators.

Defendants Charles Bond, Trevor Connors, and Gilbert Conway filed motions to suppress communications intercepted pursuant to those Title III, "wiretap" orders.  ECF Nos. 181, 184,[2] 188.  Mr. Bond used a phone number subject to such orders, and Messrs. Connors and Conway were intercepted on phone calls subject to the Title III orders.  Each movant avers that the interception orders were invalid for various reasons, including lack of probable cause, lack of exhaustion, failure to terminate, and failure to minimize interceptions as required.

For the reasons stated herein, the Court should find each authorization order valid and deny the motions to suppress communications intercepted pursuant to the Title III orders.

### A.  <u>Legal Standard</u>

Title 18 of the United States Code, Section 2518(3)(a) provides that an application for a wiretap must contain facts establishing probable cause that an individual is committing, has committed, or is about to commit one of the offenses enumerated in 18 U.S.C. § 2516.  Section 2518(3)(b) states that a wiretap application must contain facts establishing probable cause for belief that communications concerning that offense will be obtained through interception.  Section 2518(3)(d) provides that an application for a wiretap must contain facts establishing probable cause that: (1) that the target facilities are being used or are about to be used in connection with an enumerated offense; (2) that the target facilities are leased to or listed in the name of an individual believed to have committed an enumerated offense; or (3) that the target facilities are commonly used by an individual believed to have committed an enumerated offense.

---

[2] Connors' motion references interceptions over what was referenced as Target Telephone 6, which was attributed to Ronald Green, a defendant in another case.  *See* JKB-20-0385.  The government does not believe that Connors was intercepted over Target Telephone 6.  As a result, this response does not address here the validity of any application regarding Target Telephone 6.

The standard of review governing affidavits in support of wiretap orders is identical to the standard governing the review of search warrants; for a wiretap order is a specialized sort of search warrant. *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983). A judicial officer's determination that there is probable cause to issue a search warrant is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)). Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than that required by the preponderance-of-the-evidence standard, *see Gates*, 462 U.S. at 235; *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false."). Probable cause may be established through information provided by any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip that has been corroborated, *see Gates*, 462 U.S. at 241.

It is axiomatic that such affidavits "must be tested and interpreted by magistrates in a common sense and realistic fashion . . . . Technical elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). "It is sufficient that the information in the affidavit, when assessed in its totality, was sufficient to support a reasonable belief that evidence of criminality by the subject of surveillance would be obtained." *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988). When an issuing judge makes a finding of probable cause, a reviewing court should not review

that decision in a "hypertechnical, rather than common sense manner." *Ventresca*, 380 U.S. at 109.

A reviewing court is not to substitute its judgment as to probable cause but need only determine whether there was a substantial basis for the issuing court's determination of probable cause. *Gates*, 462 U.S. at 238-39. In applying for an order authorizing interception of electronic communications, "it is not necessary for the applicant to prove beyond a reasonable doubt that the communications concerning the offense will be obtained, but only that there is a fair probability thereof." *United States v. Depew*, 932 F.2d 324, 327 (4th Cir. 1991).

The "determinations by an issuing judge are accorded substantial deference" when reviewing wiretap orders. *United States v. McKinney*, 785 F. Supp. 1214, 1220 (D. Md. 1992). In *McKinney*, Chief Judge Black further explained:

> Applications for electronic surveillance orders, like search warrants, are to be read in a common sense and realistic fashion. . . . Assessments concerning probable cause are to be made after the totality of the circumstances test has been used to determine the adequacy of the application. . . . The function of this Court, which is essentially reviewing the previous findings of [the issuing judge], is not to make de novo determinations of sufficiency as if it were [an issuing judge], but to decide if the facts set forth in the application were minimally adequate to support the determination that was made.

*Id*. (internal quotation marks and citations omitted). *See also Depew*, 932 F.2d at 327.

In addition to showing probable cause, wiretap affidavits must also make a required showing of the exhaustion of alternative techniques. Title 18 of the United States Code, Section 2518(1)(c), provides in pertinent part that each application for a wiretap shall include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Section 2518(3)(c) provides that a judge may issue an order authorizing a wiretap if the application

provides facts showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

The Fourth Circuit has held that the appellate court owes "considerable deference" to the district court's determination regarding satisfaction of Section 2518(3)(c)'s exhaustion requirement. *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995); *United States v. Smith*, 31 F.3d 1294, 1298 (4th Cir. 1994) (declining to announce a standard of review but, after reviewing various standards applied in other circuits, holding that the standard should be one that gives the issuing judge's exhaustion determination "considerable deference"); *accord United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (same). Accordingly, an issuing judge's determination that the exhaustion requirement was satisfied should be accorded the highest degree of deference.

Sections 2518(1)(c) and (3)(c) of Title 18 were designed "to ensure that the relatively intrusive device of wiretapping was not routinely employed as the initial step in an investigation nor resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Smith*, 31 F.3d at 1297 (internal citations); *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). The Fourth Circuit explained that while wiretaps are an extraordinary investigative tool, they are also necessary tools of law enforcement and that Section 2518(1)(c) should not be read in an overly restrictive manner. *United States v. Leavis*, 853 F.2d 215, 221-22 (4th Cir. 1988). The Fourth Circuit has noted, time and again, that, "the burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion' . . . that does not hamper unduly the investigative powers of law enforcement agents." *Smith*, 31 F.3d at 1297 (quoting *United States v. Clerkley*, 556 F.2d 709, 714 (4th Cir. 1977)).

The government has never been required to show that other investigative methods have been wholly unsuccessful or that it has exhausted "*all* possible alternatives to wiretapping." *Smith*, 31 F.3d at 1297 (emphasis in original); *Clerkley*, 556 F.2d at 709. Rather, the language of Section 2518(1)(c) is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Kahn*, 415 U.S. at 153 n.12. At the same time, the purpose of the exhaustion requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974). Nor does a wiretap need to be used only as a last resort. *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir. 1975).

Courts have also held that, in assessing the need for a wiretap, affiants are authorized to rely upon, and courts are entitled to consider, their knowledge, training and experience as to whether a particular investigative technique will fail. *See Smith*, 31 F.3d at 1299 (issuing court may consider affirmations which are founded in part on experience of specially trained agents). Furthermore, it is permissible for affiants to opine as to whether a particular procedure will succeed or fail. *Clerkley*, 556 F.2d at 715 (reasonable conclusions about the productivity of certain techniques were sufficient to show need).

Similarly, while the necessity determination may not rely *entirely* on boilerplate language, the fact that affidavits include assertions about some traditional investigative procedures that *are* boilerplate does not preclude the finding of necessity. *See United States v. Milton*, 153 F.3d 891, 895 (8th Cir. 1998). Narcotics investigations, like the one here, suffer from common investigatory problems that lead to permissible boilerplate language in a wire affidavit because the courts'

commonsense approach recognizes that experienced agents repeatedly run into the same problems in these types of investigations.  As the Ninth Circuit has noted in similar circumstances, "we have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of main coconspirators, but not to apprehension and prosecution of suppliers, major buyers or other satellite conspirators."  *United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir. 1990).  Similarly, in *Clerkley*, the Fourth Circuit explained that even where there was probable cause to arrest four of the principals named in the wiretap orders, the government was not precluded from carrying the investigation further.  556 F.2d at 714.

As discussed below, this case involved a narcotics investigation and contained many of the attributes of such investigations: unidentified accomplices, stash locations, meeting locations, possible presence of firearms, and myriad other investigative points that could only be discovered via a wiretap authorization.  As such, the wiretap applications complied with every requirement of the law.  This case is not one that, as the defendants suggest, "employed [a wiretap] as the *initial* step in criminal investigation."  *United States v. Giordano*, 416 U.S. 505, 515 (1974) (emphasis added).  The government will address each challenged affidavit in turn.

### B.  Application for Target Telephones 1 and 2 – August 16, 2019.

Target Telephone 1 was used by Wesley Clash, a defendant in a related case,[3] and Charles Bond, a defendant in this case who was, at times, identified as acting in concert with Mr. Clash and others associated with "Dirty Sprite," which Clash was affiliated with.  The supporting affidavit for the first wiretaps in this case is attached as Exhibit A.

---

[3] *See United States v. Clash, et al.*, JKB-20-0268 (D. Md.).  Some other individuals referenced by name in this response are named defendants in that case.

First, the affidavit established probable cause to believe that both Clash and Bond used their respective phones in furtherance of ongoing drug trafficking activities. The background of the investigation noted the identification of both individuals as being associated with "Dirty Sprite." A confidential source advised investigators of "Dirty Sprite" and some of its members, including both Clash and Bond. Ex. A at ¶ 25. That source explained that s/he contacted Clash on Target Telephone 1 to discuss drug-related matters and that Bond acted as a lookout for Clash's group. *Id.* ¶¶ 25a, 25d. Similarly, after identifying Bond as also being associated with "Bullseye," the confidential source said that in July 2019, s/he discussed controlled substances with Bond via Target Telephone 2. *Id.* ¶ 28b. The source stated that Bond had a "falling out" with Clash in July and, as a result, began working with "Bullseye," which was led by Jerold Gilliam. The source identified both DTOs as operating in the 500 block of Sanford Place. *Id.* ¶¶ 23, 27.

Law enforcement then corroborated and expanded on the drug trafficking information via visual surveillance on various dates in 2019. For example:

- In June 2019, among other times, investigators observed via Citywatch cameras some of the individuals by the confidential source engaged in conduct consistent with drug trafficking in the areas identified: that is, hand-to-hand transactions involving the exchanges of items for money, retrievals of bags (suspected to have controlled substances) before meeting with buyers, and the recovery of vials of suspected cocaine from one of the previously identified Dirty Sprite members. *Id.* ¶¶ 36-38.

- On July 30, investigators observed Bond overseeing a large crowd believed to be, based on various factors, individuals looking to purchase drugs. The crowd had been standing for approximately ten minutes, as if waiting for something, before going into an alleyway near the 1300 block of West North Street. The crowd left the alley on foot within minutes. *Id.* ¶¶ 39-40.

- On July 31, investigators observed Bond engaged in hand-to-hand transactions in the 500 block of Cumberland Street. Officers then stopped Bond and recovered a clear bag containing 34 gelatin capsules—a common packaging for individual doses of controlled substances—and $243. *Id.* ¶ 41.

13

The locations of these observations—2300 block of Division Street, 1300 block of West North Avenue, and 500 block of Cumberland Street—are all in the area of the 500 block of Sanford Street first identified by sources. (The red marker below denotes 500 Cumberland Street.)



Further corroborating the information about drug trafficking activity, DEA completed several controlled purchases of suspected narcotics.  On July 17, a confidential source purchased 16 gelcaps from an individual associated with Dirty Sprite in the 500 block of Sanford Place.  Ex. A at ¶ 43.  On July 24, another controlled purchase occurred in the 500 block of Sanford Place, this time involving 16 gelcaps.  *Id.* ¶ 43.  44.  The following week, in the same block, investigators conducted two controlled purchases from individuals associated with "Bullseye": 25 gelcaps on July 30 and 10 gelcaps on August 1.  *Id.* ¶¶ 44-45.  Also on August 1, undercover officers completed two controlled purchases: 10 gelcaps from an individual advertising "Sprite, Sprite, Sprite, Sprite" and 10 gelcaps from Myeasha Jones, an individual a confidential source previously identified as being associated with "Dirty Sprite."  *Id.* ¶¶ 28c, 47.

14

Investigators also corroborated the use of Target Telephones 1 and 2 in drug trafficking activities.  The affidavit sets forth communications made to Clash and Bond where the parties discussed drug trafficking activity.   Controlled calls and text messages with Clash occurred between July 23 and July 30, 2019, where the confidential source sought to arrange purchase of narcotics.  *Id.* ¶ 50-54.  On Target Telephone 2, Bond discussed drug trafficking with associates. Outgoing calls from an incarceration facility to Target Telephone 2 was recorded as part of the facility's regular practice. On those calls, Bond acknowledged that he was "on the block"— understood by the affiant to be a common term used by drug traffickers to reference the area in which they operate—and noted who was "outside" with him.  *Id.* ¶¶ 56-59.  On July 1, Bond said he was outside with "Slick" and "Kevin"—both individuals identified at other times as "Dirty Sprite" members[4]—and could be heard agreeing to sell an unidentified person "fifteen" of "dope," a recognized reference to controlled substances.  *Id.* ¶ 58-59.[5]  During a July 3 call, Bond made statements consistent with directing someone to avoid police presence while completing a drug sale.  During this call, the caller appeared to refer to Bond as "Chuck," a common nickname for Charles.  *Id.* ¶ 60-61.

Additional techniques confirmed Bond's use of the phone.  On July 15, after receiving information that Bond was engaged in hand-to-hand transactions, investigators identified Bond on video surveillance and placed a "spoof" call to Target Telephone 2.  Bond's answering of the phone at the same time confirmed that he did in fact use Target Telephone 2.  *Id*. ¶¶ 63-64.  On July 30, investigators arranged for a controlled purchase of narcotics from Bond.  Through a

---

[4] Both individuals, as well as the aforementioned Vincent Davis and Myeasha Jones, are charged in *United States v. Clash*, JKB-20-0268.

[5] Confirming his association with Clash, Bond discussed "Wes" with the associate who called from the facility.

controlled call, a confidential source arranged a sale from Bond, who advised of usual prices for certain quantities (a "jiffy" for $300) before offering a $250 sale. *Id.* ¶¶ 69-70.  In subsequent communications, after the source asked Bond for "25," Bond directed the confidential source to "the hole" to avoid police presence.  The source then purchased 25 gelcaps for $250 from an individual previously identified as a Bullseye associate; in completing the sale, the source told the seller that s/he had previously arranged with Bond purchasing the 25 gelcaps. *Id.* ¶¶ 71-74.

In sum, controlled calls revealed that Clash used Target Telephone 1 to discuss his availability to conduct drug transactions, and controlled and recorded jailhouse phone calls revealed that Bond used Target Telephone 2 to facilitate drug sales and otherwise discuss drug trafficking activities.

The affidavit provided a phone records/toll analysis that corroborated the phones' ongoing use in support of drug-trafficking activities. *Id.* ¶¶ 75-82.  Target Telephone 1 had a high volume of call activity, with many calls being short in duration, usually less than one minute. *Id.* ¶ 76. The same was true of Target Telephone 2. *Id.* ¶ 80.  The phones' records reflected numerous contacts with persons who themselves had been involved in some of the controlled purchases referenced above. *Id.* ¶¶ 78, 82.  The records of this ongoing usage, combined with the previous information that the phones had in fact been used for drug trafficking activities, left no doubt that the phones were drug trafficking phones, that Clash and Bond had committed and were committing federal narcotics offenses, and that communications concerning federal narcotics offenses would be obtained through the interception and monitoring of the target telephones. *See* 18 U.S.C. §§ 2518(a), (b).

As to exhaustion and necessity, the affidavit provided a thorough analysis as to why the wiretap was necessary, that is why other investigative procedures had been tried or appeared

unlikely to succeed.  *See* 18 U.S.C. § 2518(d).  The investigators had conducted a lengthy investigation prior to seeking a wiretap—with information dating back to March 2019—and had attempted or considered a range of other investigative techniques:

- Confidential sources had been considered.  *Id.* ¶¶ 84-85.  Indeed, one confidential source had in fact provided information about the DTOs, and both assisted with controlled purchases.  However, confidential sources are inherently limited in their ability to acquire information about drug organizations, including information about individuals and operations not directly involved in hand-to-hand sales to end users of narcotics.

- Undercover police investigation was considered.  *Id.* ¶¶ 86-89.  Likewise, that posed limitations because, as a practical matter, undercover operatives were not always able to penetrate far into a drug organization's supply chain.  *Id.* ¶ 88.  For example, undercover operations were not always able to identify the locations of stash points, other associates, suppliers, and so forth.  *Id.*

- Physical surveillance was considered.  *Id.* ¶¶ 90-93.  The affidavit laid out specific instances of surveillance efforts.  That surveillance had revealed locations and the presence of Bond and other persons associated with Bond and Clash's organizations.  *Id.* ¶ 90; *see also id.* ¶¶ 31-41.  The obvious reality, of course, is that surveillance could only go so far before alerting investigative subjects of the investigation, thereby causing them to alter patterns to avoid additional surveillance.  *Id.* ¶ 93.  In addition, the frequent use of alleys (e.g., the "hole," as Bond once described) to conduct drug sales limited the ability to establish and maintain effective surveillance.  *Id.* ¶ 92

- The affidavit detailed consideration of several other investigative methods. *Id.* ¶¶ 94-103. Those efforts included pole cameras, CCTV cameras, and other mobile surveillance equipment. *Id.* CCTV surveillance enabled observation of drug transactions, but interdictions into those transactions yielded only small amounts of drugs possessed by the street-level sellers and offered no insight into larger stashes and individuals higher in the organizational hierarchy. *See id.* ¶¶ 95-98 Investigators attempted to place cameras in and around the groups' place of operations near the 500 blocks of Sanford Place and Cumberland Streets, adjacent to the Pennsylvania and North intersection in Baltimore City. *Id.* ¶¶ 99-100. However, the rear alley of Sanford Place was too narrow for the pole camera installation truck to enter, and attempts to place a covert vehicle camera were detected almost immediately by individuals acting as lookouts. *Id.* A camera installed on Division Street, about one and a half blocks away from the central activity area, was too far to provide much useful information related to locations and vehicles used by conspirators. *Id.* ¶ 101. GPS tracking methods was considered (and later used) for various phones associated with the organizations, and investigators had confirmed Clash's use of a certain vehicle. *Id.* ¶ 102; *see also id.* ¶ 25b. The reality, as with other techniques, was that these methods would reveal information about Clash (but not Bond or others) and might allow surveillance of comings and goings without any other information about the nature and purpose of such travels. Physical tracking and surveillance might place a person at a location at a time, but only wiretap monitoring would definitively reveal the reason for a person's travels or conversations with another person or provide

advance knowledge of a meeting so that law enforcement planning could occur.  In addition, the lack of pinpoint location accuracy in a dense environment imposes limits on the quality of phone location data absent additional information.  *Id.* ¶ 102.

- The affidavit discussed the use of telephone records and pen registers.  *Id.* ¶¶ 109-11.  Such methods had been used and were incorporated as part of the interception request (see above).  But that did not mean that mere records would allow for a complete investigation.  Certainly, investigators made effective use of telephone records information to help establish Bond's (and Clash's) use of telephones during drug trafficking activities.  But records alone were not sufficient to advance the case: while, as reflected above, these records show *contact* between two modes of communication; the usefulness of that information was limited without knowing the *contents* of those communications.  *Id.* ¶ 109.

- Grand jury and witness interviews were considered.  *Id.* ¶¶ 112-15.  Limitations included the simple absence of such witnesses, and the inability to secure cooperation from such witnesses even if they could be identified.  *Id.*

- Search and arrest warrants were considered.  *Id.* ¶ 116.  Although search warrants could be an effective way to advance an investigation, investigators did not know the location of particularly useful locations to search at the time.  Wiretap monitoring, of course, had the potential to help identify such locations.  By way of example, as of the writing of the affidavit, investigators had not yet even identified the location of Bond's (or Clash's) residence.  *Id.*

- Trash runs were discussed as an option.  *Id.* ¶ 117.  Notwithstanding the fact that stash houses and residences had not yet been identified, *see supra*, trash runs had

19

only a marginal possibility of revealing useful information about the case such as the roles and identities of certain individuals.  *Id.*

In sum, the initial affidavit provided probable cause to believe that Bond and Clash were engaged in drug-trafficking and that they used both target cellular phones in support of that activity.  The affidavit also established "exhaustion" of other methods and the "necessity" of the requested wiretaps.

### C. Application for Continued Interception of Target Telephones 1 and 2 – September 12, 2019.

Following several weeks of interceptions on Target Telephone 1 and Target Telephone 2, investigators applied to continue the previously authorized interceptions.  A copy of the affidavit supporting that request is attached as Exhibit B.

The first period of interceptions confirmed Bond's drug trafficking involvement.[6]  Ex. B at ¶¶ 41-61.  For example, during one call on August 22, 2019 at 6:43 p.m., the caller asked if Bond had "anything good" and said he was "looking for Bullseye," to which Bond responded, "we done for the day." When the caller inquired about the hours, Bond advised they "come out at five in the morning" and then confirmed they stopped at about 5:00 p.m.  *Id.* ¶ 44.  During an August 26 call, an associate asked if Bond was "out," to which Bond responded "yeah." The associate later said he would "put some more together for" Bond—a statement investigators interpreted, based on the "out" comment, to indicate a resupply of narcotics to sell.  *Id.* ¶¶ 48-49.  The next day, Bond called the same associate and stated, among other things, that he had a "play getting ready to come through" and that the person "want[ed] a whole jim-rod," which investigators

---

[6] The application also discussed Clash's calls in detail.  Ex. B at ¶¶ 24-40.  These calls reflected both drug trafficking and potential firearms possession.  This response continues to focus primarily on the authorization's validity as to Bond because except for Bond, the defendants in this case were not intercepted on Clash's phone.

interpreted as reference to a certain quantity of narcotics. *Id.* ¶¶ 50-51.  Other calls were consistent with individuals attempting to arrange sales with Bond.  *See id.* ¶¶ 42-43, 52-55.  On September 1, Bond called Clash (Target Telephone 1) and asked for "a quarter" or "a quart of water."  The affiant, based on experience and training, took this to be a reference to a quarter ounce of drugs, likely cocaine.  *Id.* ¶¶ 56-57.  Dashelle Claridy, another "Dirty Sprite" member, was with Bond at the time, and Claridy and Clash discussed money that Clash intended to pick up.  *Id.*  Bond called Clash a few days later and made another request for "a quart of water," to which Clash responded that he wanted "three fifty."  Investigators interpreted this as Clash charging Bond $350 for the drugs.  *Id.* ¶¶ 58-59.  On a September 5 call, Bond explained to an associate that the associate "is the runner" and the runner's job is to "collect money."  This reflected not only Bond's involvement in drug trafficking generally but his direction of others beneath him in the operational hierarchy.  *Id.* ¶¶ 60-61.

Like in the original application, this affidavit set forth why wiretap investigation was necessary and why other investigative means had been exhausted or would have been futile.  The facts and circumstances were similar to the previous affidavits, and addressed confidential sources, undercover efforts, physical surveillance, and other methods such as CCTV cameras, GPS trackers, toll analysis, grand jury and witness interviews, search warrants, trash runs, prior wiretaps, and jail calls.  *Id.* ¶¶ 62-106.  Those efforts had varying degrees of usefulness, but none were as effective as continuing to monitor the conspiracy's activities through wiretaps.  Some methods were less effective than before due to changing patterns: investigators received information that Bond had moved locations for some period of time out of fear of being identified by law enforcement.  *Id.* ¶ 66.

**D. Application for Initial Interception of Target Telephones 4 and 5 – September 20, 2019.**

On September 20, 2019, investigators applied to intercept Target Telephone 3, used by an individual believed to be associated with Clash/"Dirty Sprite," and two phones used by Akeem Ross, Target Telephone 4 ,and Target Telephone 5. A copy of the affidavit supporting that request is attached as Exhibit C.

The affidavit established probable cause to believe that Ross used his phones in furtherance of ongoing drug trafficking. It began by setting forth information from confidential sources about the "Bullseye" organization, including Ross' assumption of control of day-to-day operations after Bond was arrested in August 2019 and moved to a different area temporarily.[7] Ex. C. at ¶ 28. The source further advised as to the "Bullseye" operation: Ross delivered packs of drugs every morning to DTO members responsible for street-level sales while others acted as lookouts. At the end of each day, Ross returned to the area of 500 Sanford Place to collect the day's sales proceeds. *Id.* ¶¶ 29-30. A different source provided information about Clash and "Dirty Sprite" as well as "Bullseye." According to that source, "Bullseye" had become the most successful operation in the area, with Ross running the day-to-day operations. However, that source was not in a position to contact Ross directly. *Id.* ¶¶ 32-35.

After providing details of calls between Clash and the user of Target Telephone 3, *id.* ¶¶ 36-64,[8] the affidavit discussed Ross' use of his phones to facilitate drug trafficking. Some of these

---

[7] Bond was arrested on August 15, 2019 and held without bail for about six days. Ex. B at ¶ 41.

[8] The government does not anticipate the existence of any evidence in this case that the defendants were intercepted on Target Telephone 3 and, thus, that it would seek to admit any communications intercepted over Target Telephone 3. For this reason, this Response focuses on the validity of the orders as to Target Telephone 4 and Target Telephone 5. However, the government believes that the application and order are as valid as to Target Telephone 3 as it is to Target Telephones 4 and 5 and, as a result, interceptions of Target Telephone 3 are lawful and

calls involved Bond, who would advise early in the morning his location—activity consistent with Bond being involved in helping to begin the DTO's daily operations. *Id.* ¶¶ 66-69. After a source provided Ross' phone number as Target Telephone 5, investigators called a phone while observing Ross on camera; when he answered the phone at the time of the call, investigators confirmed Ross' use of that phone. *Id.* ¶¶ 70-73. In a controlled call to Target Telephone 5 on September 4, a confidential source told Ross s/he "need[ed] 25" and asked whether that was "possible;" Ross responded "Yeah, yeah. Just give me a call when you'll be ready." *Id.* ¶¶ 79-82. Using a covert surveillance camera, agents observed Ross enter a residence after the controlled call, leave the residence about fourteen minutes later, and drive from the area. Through physical surveillance, they observed Ross arrive on Baker Street in Baltimore. The confidential source then met Ross in the 600 block of Baker street and purchase 25 gelcaps for $250. *Id.* ¶¶ 83-86. The next day, Bond called Target Telephone 4 twice between 5:30 and 6:00 a.m. and discussed with Ross opening the DTO for the day. *Id.* ¶¶ 87-88. On September 10, the confidential source called both of Ross' phones to arrange a drug purchase, advising "I'm coming through in twenty minutes, same thing." Ross acknowledged the request and said to call when s/he arrived. The source traveled to the 600 block of Baker Street and called Target Telephone 5 to say s/he arrived. Ross then met the source and sold him/her 25 gelcaps for $250. *Id.* ¶¶ 89-95.

The affidavit's phone records/toll analysis described a high volume of short calls. *Id.* ¶¶ 96-118. Target Telephone 4 averaged 54 voice calls per day between July 12 and September 8; approximately 84% of calls during this period lasted one minute or less. *Id.* ¶¶ 101-02. Approximately 270 calls during that time were to a number associated with a woman identified at the time as UF2723. *Id.* ¶ 103. UF2723 was also intercepted on Bond's phone, and the content of

---

admissible.

Bond's calls led investigators to believe that Bond used UF2723's address as a stash house. *Id.* ¶ 105-06. The address associated with 2723 is the same address where Ross entered just before meeting the controller purchaser on September 4. *See id.* ¶ 84-85. Based on the content of Bond's calls with UF2723 and Ross' frequent contact with UF2723, investigators concluded that Ross used Target Telephone 4 in connection with "Bullseye's" use of UF2723's residence as a stash house. *Id.* ¶ 107.

Toll analysis of Target Telephone 5 supported similar conclusions about drug trafficking. Call records showed 751 calls between August 6 and September 8. *All* of those calls were one minute or less. *Id.* ¶ 108-09. Furthermore, between August 24 and September 6, Target Telephone 5 had frequent contact—132 calls—with an unidentified male using a phone number ending in -1081 (UM1081). Interceptions of Bond's phone included 13 calls with UM1081. *Id.* ¶ 111, 114. One of those calls was the aforementioned discussion Bond had with someone who was supposed to perform certain actions as the "runner"; UM1081 was that "runner" that Bond expected to go pick up packs and collect money. *Id.* ¶ 112-13.

The short duration and high volume of calls on both of Ross' phones, as well as their contents as revealed by controlled calls and interception of Bond's phone, supported the investigators' conclusion about their use in drug trafficking and Ross' use of them to facilitate such trafficking. The affidavit also noted that the phones appeared to serve different purposes, as only eight unique contacts appeared in both phones' call records. *Id.* ¶¶ 115-18. As such, communications concerning federal narcotics offenses would be obtained through the interception and monitoring of both of Ross' target telephones. *See* 18 U.S.C. §§ 2518(a), (b).

As to exhaustion and necessity, the affidavit again provided a thorough analysis as to why the wiretap of these phones was necessary and why other, non-interception investigative

procedures had limited value or appeared unlikely to succeed.  *See* 18 U.S.C. § 2518(d).  The investigators summarized those other investigative techniques as follows:

- Prior interceptions—of Clash's and Bond's phones—were discussed as having limited value regarding the "Bullseye" group. *Id.* ¶¶ 121-25.  Clash's interceptions were useful (but still did not meet all goals) in investigating "Dirty Sprite." However, because Bond had appeared to have left the aera where "Bullseye" (and "Dirty Sprite") operated,[9] continued interception of Target Telephone 2 provided information valuable to his activities but less valuable to "Bullseye." *Id.* ¶ 123. Instead, interception of Ross, having assumed a greater role in the group, was more likely to help identify higher ranking members than some of the other street-level sellers identified by confidential sources. *Id.* ¶ 125.[10]

- Confidential sources had been considered. *Id.* ¶¶ 126-29.  Like with the previous applications, confidential sources—including ones who had been helpful in this investigation—are inherently limited in their ability to acquire information about certain aspects of drug organizations, which are often compartmentalized.

- Undercover police investigation was considered. *Id.* ¶¶ 130-34.  The same limitations previously discussed with this method applied with equal force: this would likely be successful in prosecuting the lowest levels of a drug trafficking

---

[9] Information suggested Bond had moved to the Brooklyn neighborhood in southern Baltimore. *Id.* ¶ 123.  He had not been in contact with Ross or even UM1081 since early September.  *See id.* ¶¶ 87, 114.

[10] Similarly, interception of Target Telephone 3 was likely to help identify sources of supply for Clash and the identities of certain individuals observed and intercepted on other phones but not yet identified.

organization but, not unlike confidential sources, offer little intelligence or information about higher ranking members or supply sources. *See id*. ¶¶ 132-34.

- Physical surveillance was considered. *Id.* ¶¶ 135-40. The affidavit noted the same limitations articulated in previous applications continued to apply.

- The limitations of several other investigative methods were addressed. *Id.* ¶¶ 141-69. As to camera installations, beyond what was previously noted, the affidavit explained that pole camera installation requests at suspected stash houses were pending. *Id.* ¶ 148. But they carried the same limitations that any other location-based surveillance carried: they could identify *where* a person was but, absent communications interception, not *why* the person is in a particular location. Lay testimony in grand jury continued to be unlikely to further the investigation. Recent arrestees refused to speak with law enforcement at the time of the arrest; there was little reason to think further attempts would be fruitful. In addition, Bond was a particularly unlikely source of grand jury testimony; because he moved to a different area of the city to avoid detection by law enforcement, there was little chance he would willingly admit to any involvement in and knowledge of unlawful activity. *Id.* ¶¶ 162-65. While search warrants of suspected stash houses would yield useful evidence, this technique is limited because the searches of stash houses were unlikely to identify larger operational details and how, if at all, proceeds were distributed and/or laundered. *Id.* ¶¶ 166-67. Trash runs had been attempted during the week of August 26, 2019 and were not useful: substantial foot traffic posed risk of uncovering the investigation, trash was not being placed out for long periods of

time, and trash was sometimes placed within the yard of the suspect residence (thus preventing investigators to access it). *Id.* ¶¶ 167-69.

In sum, the initial affidavit for Target Telephones 4 and 5 provided abundant probable cause to believe that Ross was engaged in drug-trafficking, and that he was using both target cellular phones in support of that activity. It also established "exhaustion" of other methods attempted since the initial interceptions in this investigation and the "necessity" of the requested wiretaps to further the goals of the larger investigation.

### E. Application for Continued Interception of Target Telephones 4 and 5 – October 18, 2019.

Following several weeks of interceptions on Target Telephone 4 and Target Telephone 5, investigators applied to continue the previously authorized interceptions on those phones.[11]  A copy of the affidavit supporting that request is attached as Exhibit D.

The first period of interceptions further confirmed Ross' drug trafficking involvement. Ex. D at ¶¶ 51-100.  For example, on August 22, 2019 at 7:11 a.m., Ross spoke with UF2723 via Target Telephone 4.  Ross asked how often another associate had visited UF2723's residence.  She noted that she "gave [the associate] three thinking, we thinking the crowd comes at five thirty, so he ain't been back since."  The two also discussed their expectations that things would be "slow" because it was a Sunday.  *Id.* ¶ 52-53.  The next day, Ross used Target Telephone 4 to speak with co-defendant James Meekins.  Meekins told Ross that he had given everything to Ross when Meekins was outside.  This was consistent with information developed about Meekins managing stashes of

---

[11] The application also sought (and ultimately obtained) authorization to continue interceptions over Target Telephone 3.  Because the interceptions over that phone do not involve communications of the defendants here, the facts related to this phone are not discussed separately.  But the government believes the probable cause as to that line is substantial, *see* Ex. D. at ¶¶ 28-50, and the exhaustion and necessity arguments presented later in this subsection apply with equal force to Target Telephone 3.

narcotics for the "Bullseye" DTO.  *Id.* ¶¶ 54-55.  On September 27, Ross, via Target Telephone 4, again spoke with Meekins about drug inventory.  This time, Meekins said he was "down to two," which Ross did not appear to expect, as he responded, "What do you mean you're down to two." *Id.* ¶ 56.  Two days later, Ross used Target Telephone 4 to speak with an unidentified female (UF2993).  When Ross asked, "you said 12," UF2993 responded, "yes, it was 38 pills."  The continued to discuss, with Ross complaining about someone "miscounting" 12 pills.  *Id.* ¶¶ 58-59.

Ross continued to use Target Telephone 4 to speak with UF2723 and Meekins about narcotics.  *Id.* ¶¶ 60-61 (Meekins advising he was "down to four jimmy macks," a reference to "packs" of controlled substances); ¶¶62-63 (UF2723, after 5:00 p.m. that day, advising Ross could "come around" when he was ready, which was consistent with Ross using her residence to store and retrieve narcotics and proceeds); ¶¶ 64-65 (UF2723 advising Ross that another associate had "the last one"—believed to be the last pack of narcotics—and inquiring whether Ross received the "ready money"—cocaine sales proceeds); ¶¶ 66-67 (Ross and UF2723 discussing a recount of proceeds); ¶¶ 68-69 (Meekins advised he received "five" from a female associate); ¶¶ 70-71 (October 7 call where Ross tells UF2723 to call Bond and see what he wants); ¶¶ 72-73 (confirming to UF2723 the shop would shut down at 5:00 p.m. and not "go[] into overtime"); ¶¶ 74-75 (UF2723 advised she was bringing items to Sanford Place).  He also used this phone to speak with another co-defendant, Welton Whittington, Jr.  Whittington said that he was checking on the street inventory at the behest of UF2723. *Id.* ¶¶ 76-77.

The affidavit also reflected drug-related conversations occurring over Target Telephone 5. *Id.* ¶¶ 78-100.  On September 23, defendant Isaiah Timms used Target Telephone 5 to arrange a narcotics sale.  *Id.* ¶¶ 79-80.  The next day, Ross spoke to Meekins and discussed how Meekins and Bond managed sales proceeds as well as the inventory status.  *Id.* ¶¶ 83-84.  On one date, Ross

spoke to UF2723 and discussed Bond's failure to show up where he said he would.  *Id.* ¶¶ 85-86.

On various dates between September 30 and October 8, Ross asked Meekins discussed narcotics

inventory, sales proceeds, conducting sales, and resupplying the street-level sellers.  *Id.* ¶¶ 87-92,

95-98.  On October 6, Ross arranged a meeting with UF2723.  *Id.* ¶¶ 93-94.  On October 13, Bond

used Target Telephone 5 to speak with UF2723 about inventory and Ross meeting at UF2723's

residence.  *Id.* 99-100.

Like in the original application, this affidavit set forth why wiretap investigation was

necessary and why other investigative means had been exhausted or would have been futile.  The

facts and circumstances were similar to the previous affidavits, and addressed confidential sources,

undercover efforts, physical surveillance, and other methods such as CCTV cameras, GPS

trackers, toll analysis, grand jury and witness interviews, search warrants, trash runs, prior

wiretaps, and jail calls.  *Id.* ¶¶ 101-50.  Those efforts had varying degrees of usefulness, but none

were as effective as continuing to monitor the conspiracy's activities through wiretaps.  In person

surveillance was difficult because individuals warned others when marked law enforcement

vehicles entered an area.  *Id.* ¶ 121.  Additional visual surveillance had been attempted via

additional pole cameras.  However, one camera could not pick up activity in the alleys—where

sales often occurred.  *Id.* ¶ 129.  A few days before the affidavit, a camera had been installed near

a suspected stash location, although its operation would not likely identify additional conspirators

or the origin of the DTO's narcotics.  *Id.* ¶ 131.

### F.  There Was No Violation of the Wiretap Minimization Requirements.

The defendants claim generally that the government failed to comply with the minimization

requirements of the federal wiretap statute.  This argument also fails.  Title 18 of the United States

Code section 2518(5) contains the minimization requirements for a wiretap and reads, in pertinent

part, as follows:

Every order and extension thereof . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon the attainment of the authorized objective . . . In the event the intercepted communication is in code or a foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.  An interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

In this case, the initial interception application contained the following language:

All monitoring of wire and electronic communications over **TARGET TELEPHONE 1** and the interception of wire communications over **TARGET TELEPHONE 2** will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will terminate upon the authorized objectives or, in any event, at the end of thirty (30) days measured from the earlier of the day on which law enforcement officers first begin to conduct an interception under this Order or ten (10) days after the Order is entered.  Monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the target subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.  If a conversation has been minimized, the monitoring agents will spot check to ensure that the conversation has not turned to criminal matters.  Special attention shall be given to minimize all privileged communications.

All monitoring of electronic communications over **TARGET TELEPHONE 1** will be conducted in accordance with Chapter 119 of Title 18, United States Code.  Each electronic communication (i.e. text message) will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature.  If the message is not criminal in nature, the message will be marked "minimized" and not accessed by other members of the investigative team.  If the message appears to be privileged, it will be marked "privileged" and secured from access by other members of the investigative team.  If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "non-minimized" and may be shared with the other agents and monitors involved in the investigation.  If a text message

is marked "minimized" or "privileged," it will not be disseminated to members of the investigative team.  All intercepted text messages will be sealed with the court upon the expiration of the court's Order authorizing the interception.  It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored and read (including those intercepted at hours when the location was not staffed).  However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

Electronic communications over **TARGET TELEPHONE 1** will be intercepted, pursuant to the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. §§ 1001 *et seq.*, in part through receipt from the service provider of "packet data," an electronic data stream.  That packet data stream, pursuant to CALEA, will be delivered to DEA's electronic communications collection system, and when certain technology (including VoIMS, VoLTE, 4G, and others) is employed by the cellular service provider, that packet data stream will include a complete copy of all voice calls (which are wire communications) occurring over the target phone.  Those voice calls in the packet data stream are duplicates of wire communications that may be intercepted through DEA's wire communications collection system and minimized in real-time.  The packet data, including the copies of voice calls, cannot be minimized in real-time.  Therefore, DEA will utilize a filter program in its electronic communications collection system that will automatically identify and block voice calls (which are wire communications) from being intercepted by filtering them out of the electronic communications packet data stream before they enter the electronic communications collection system and are recorded.  In the rare event that a voice call is not filtered out of the packet data stream and is recorded, the call will not be monitored or otherwise accessed through the electronic communications presentation system, and DEA will preserve and seal such communications in the manner used for other intercepted electronic communications.

Exhibit A ¶¶ 119, 121-22.[12]  Each subsequent application contained the same or similar language.

The initial interception order contained the following language:

IT IS FURTHER ORDERED that such interception shall not automatically terminate when the types of communications described above have first been intercepted, but shall continue until communications are intercepted that fully reveal the manner in which the **TARGET SUBJECTS** and others as yet unknown are participating in the **TARGET OFFENSES**, or for a period of thirty days,

---

[12] Paragraph 120, omitted from this block quote, addressed the potential for translation from non-English speech to English.  Undersigned counsel is not aware at this time that translation was necessary for any calls relevant to the pending charges.

measured from the earlier of the date interceptions begin or ten days from the date
of this Court's Order., pursuant to 18 U.S.C. § 2518(5).

Ex. A1 at 5-6. Each subsequent order also contained the same or similar language. Therefore,

contrary to the defendants' suggestions, a specific plan for minimization was both stated and

ordered.

Even *if* the defense were to point to a call or calls that should have been minimized but

were not, the minimization requirement does not leave all innocent communications unheard. The

statute requires that unnecessary intrusions are to be reduced as much as possible but efforts at

minimization must be reasonable under the circumstances and reviewed on a case-by-case basis

when testing compliance. The Fourth Circuit indicated the rule for this circuit as follows:

> In analyzing a given case, the federal courts have considered three principal factors: (1)
> the nature and scope of the alleged criminal enterprise; (2) the government's reasonable
> expectation as to the content of, and parties to, the conversations; and (3) the degree of
> judicial supervision while the wiretap order is being executed.

*Clerkley*, 556 F.2d at 716.

While *Clerkley* involved the investigation of illegal gambling, these same factors are

applicable in a gang racketeering or narcotics conspiracy: "When law enforcement officials are

confronted with a large, far-flung and on-going criminal activity involving multiple parties, they

are afforded greater latitude in conducting wiretaps." *Id.* The Seventh Circuit, in considering a

drug conspiracy, held that "[l]arge and sophisticated narcotics conspiracies may justify

considerably more interception than would a single criminal episode. This is especially so where,

as here, the judicially approved purpose of the wiretap is not so much to incriminate the known

person whose phone is tapped as to learn the identity of far-flung conspirators and to delineate the

contours of the conspiracy." *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975).

As the Eighth Circuit in *United States v. Cox*, 462 F.2d 1293 (8th Cir. 1972) noted:

> [W]here as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value.

*Id* at 1300-01.

Indeed, it is impossible to determine at the outset whether a particular conversation is irrelevant until it has been terminated.  "It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated.  However, monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction a conversation will take."  *United States v. LaGorga*, 336 F. Supp. 190, 196 (W.D. Pa. 1971).

Both the thoroughness of the government precautions to bring about minimization and the degree of judicial supervision over the surveillance practices are both strong circumstantial evidence of a reasonable effort to minimize interception of innocent conversation.  *See United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000); *see also United States v. Carter*, 449 F.3d 1287, 1296-97 (D.C. Cir. 2006) (noting that the prosecutor instructed agents on minimization and reviewed call records for compliance); *United States v. Eiland*, 398 F. Supp.2d 160, 175 (D.D.C. 2005) (citing government's procedures and judicial supervision as factors tending to show government's compliance with minimization requirement).

Even *if* this Court were to find that there was a failure to minimize *some* of the calls, the remedy should not be the suppression of *all* intercepted conversations.  *See United States v. Cox*, 462 F.2d 1293, 1301-1302 (8th Cir. 1972); *United States v. Sisca*, 361 F.Supp. 735, 746-747 (S.D.N.Y. 1973); *United States v. Mainello*, 345 F. Supp. 863, 874-877 (E.D. N.Y. 1972).  Rather, at most what should be suppressed are individual calls, identified by the defendants, that the Court concludes should have been minimized but were not.

**G.  The good faith exception applies even if the affidavits are found to be invalid.**

Finally, Judge Russell's orders complied with the requirements of the law.  As such, the affiants were entitled to rely on facially valid wiretap orders that the resulting evidence would be admissible pursuant to the "good faith" exception of *United States v. Leon*, 468 U.S. 897 (1984). *Leon* has been applied to admit electronic surveillance evidence.  *See United States v. Brewer*, 204 Fed. App'x 205, 208 (4th Cir. 2006) (even if affidavit lacked probable cause or exhaustion requirements had not been met, affiants were entitled to rely on facially valid wiretap order); *United States v. Moore*, 41 F.3d 370, 376-77 (8th Cir. 1994) (good faith doctrine required that suppression of wiretap evidence be denied, despite defect in order allowing electronic surveillance).  Therefore, even assuming, *arguendo*, that the affidavits were invalid (which they were not), the Court may still receive the evidence under the good faith exception to the exclusionary rule.

## II. EACH CHALLENGED SEARCH AND SEIZURE COMPLIED WITH THE FOURTH AMENDMENT OR WAS OTHERWISE LAWFUL.

The defendants have filed numerous motions to suppress evidence obtained pursuant to various search and seizure warrants.  The searches relevant to the pending motions relied on two affidavits: one for various locations associated with the defendants in this case and the "Bullseye" DTO generally and one pertaining to Mr. Bond and various individuals and locations associated with the "Dirty Sprite" DTO.

Because "Fourth Amendment rights are . . . personal rights," *United States v. Taylor*, 857 F.2d 210, 214 (4th Cir. 1988), motions to adopt are often not appropriate vehicles for seeking suppression, *cf. United States v. Padilla*, 508 U.S. 77, 81-82 (1993) (co-conspirators lack standing to assert Fourth Amendment violations of other co-conspirators).  Notwithstanding the generalized, non-specific basis of most of these suppression motions, the United States respectfully

requests that the Court find the search warrants supported by probable cause, as required by the Fourth Amendment, and, as a result, deny the motions to suppress seizures of various items.

### A. **Legal Standard**

#### 1. Seizures pursuant to search warrants

A judicial officer's determination that there is probable cause to issue a search warrant is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).  Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than that required by the preponderance-of-the-evidence standard, *see Gates*, 462 U.S. at 235; *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false.").  Probable cause may be established through information provided by any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip that has been corroborated, *see Gates*, 462 U.S. at 241.

In addressing a motion to suppress, "the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).

A statement of probable cause in support of a search warrant need not be written with "[t]echnical elaborate specificity," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and a "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant." *United States v. Bynum*, 293 F.3d 192, 197 (4th Cir.

2002).  "Because probable cause is evaluated through a totality-of-the-circumstances analysis rooted in common sense," a reviewing court should give "great deference" to an issuing judicial officer's decision to issue a warrant based on the facts before her.  *Montieth*, 662 F.3d at 664.

The Fourth Circuit has held "that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence."  *United States v. Servance*, 394 F.3d 222, 230 (4th Cir.), *vacated on other grounds*, 544 U.S. 1047 (2005).  Thus, warrants are to be upheld "even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought" to the place to be searched.  *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005).

To challenge a search, a defendant must have standing, that is, a reasonable expectation of privacy in the place searched.  *E.g.*, *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).  Status as a co-conspirator does not confer such reasonable expectations, and thus standing, where it would not otherwise exist under the general rule.  "No expectation of privacy is created simply because one has a supervisory rule in the conspiracy or joint control over the place or property involved in the search or seizure."  *United States v. Al-Talib*, 55 F.3d 923, 930 (4th Cir. 1995) (quoting *United States v. Padilla*, 508 U.S. 77, 80 (1993)).

Even where a search warrant is found to be lacking, a court should not suppress the evidence if executing officers relied on the warrant was in good faith.  *Leon*, 468 U.S. at 913.

### 2.  Searches incident to arrest

It is well established that searches incident to lawful arrests are permissible.  *See e.g.*, *Chimel v. California*, 395 U.S. 752, 763 (1969); *United States v. Currence*, 446 F.3d 554, 557 (4th Cir. 2006) (officers relying on outstanding arrest warrant were permitted to search arrestee contemporaneous to arrest).  This exception to the Fourth Amendment's search warrant requirement is valid because of "the need to remove any weapons that the arrestee might seek to

use in order to resist arrest or effect his escape and the need to prevent the concealment or destruction of evidence." *United States v. Ferebee*, 957 F.3d 406, 418 (4th Cir. 2020) (quoting *New York v. Belton*, 453 U.S. 454, 457 (1981) (internal quotation marks omitted).  Arresting officers may search "both the arrestee's person and the area within his immediate control." *United States v. Davis*, 997 F.3d 191, 195 (4th Cir. 2021) (internal quotation marks and citations omitted). The validity of such a search does not require "'any indication that the person arrested possesses weapons or evidence. The fact of a lawful arrest, standing alone, authorizes a search.'" *Ferebee*, 957 F.3d at 418 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979)).

Even in the event an arrest warrant issued absent probable cause, the good faith exception may apply and permit seized evidence to be admitted at trial. *See United States v. Parks*, 2019 WL 2869335, at *10 (D. Md. July 3, 2019) (citing *Leon*, 468 U.S. at 913, 923).

**B.   The seizures of tangible evidence challenged by the defendants were supported by probable cause or otherwise lawful.**

Charles Bond, Trevor Connors, and Akeem Ross move to suppress physical evidence seized in this case.  Messrs. Connors and Ross seek suppression of evidence obtained  pursuant to search warrants executed on November 21, 2019 at 1946 Walbrook Avenue and 2415 W. Lexington Street, both in Baltimore.  ECF Nos. 183, 221 (motion for *Franks* hearing).  These warrants issued at the same time as warrants for other locations and individuals, and the basis for all those warrants appeared in a single affidavit. *See* Ex. E.  Mr. Bond moves to suppress evidence seized pursuant to a search warrant for 409 Millington Avenue in Baltimore.  ECF No. 190.  That warrant relied on facts different from those supporting the Walbrook and W. Lexington warrants.[13] *See* Ex. F.

---

[13] This affidavit focused on various locations and individuals associated with members of the "Dirty Sprite" DTO.  Because intercepted communications and other observations connect Mr. Bond directly to the "Dirty Sprite" DTO, the government anticipates presenting evidence

Each of these motions should be denied.  The search and seizure warrants were supported by probable cause based upon, among other things, intercepted communications and location data seized pursuant to lawful (and substantively unchallenged)[14] tracking warrants, video surveillance, and controlled purchases.

      1.   The search warrant for 1946 Walbrook Avenue was supported by probable cause.

In support of the search warrant for 1946 Walbrook Avenue and other locations, law enforcement provided various facts relating to the various participants and actions of the "Bullseye" DTO.  The narrative illustrated how Trevor Connors, Akeem Ross, and others interacted in person and via telephone calls to carry on a drug trafficking conspiracy.  The affidavit supporting the warrants connected both of these individuals to others charged and uncharged in this case, vehicles used by some of those individuals in carrying on activities at various locations, and electronic surveillance corroborating locations frequented by those involving in the possession and transport of suspected narcotics.  All of these elements presented a fair probability that evidence of their collective efforts would be located at, among other places, 1946 Walbrook Avenue.  For this reason, the motion to suppress evidence obtained from this residence should be denied.

Mr. Connors avers in general terms—little more than brief recitations of black letter law without further specific analysis—that the warrant issued on less than probable cause, on facts

---

regarding the "Dirty Sprite" DTO, including the seizures from 409 Millington Avenue, to at least Mr. Bond, if not other defendants in this case.

[14] The motions to suppress suggest, in some cases without any specific analysis, that some of the underlying evidence cited in support of the residential warrants was unlawfully obtained.  *See* ECF No. 183 at ¶ 5.  The movants lack standing to challenge any warrants pertaining to phones or vehicles not used by them.

lacking a nexus between criminal conduct and the residence, and on the basis of other evidence alleged to be illegally obtained.[15]  ECF No. 183.

c.  <u>*The affidavit set forth facts establishing a drug trafficking conspiracy, at least a half dozen participants, and the role of 1946 Walbrook Avenue.*</u>

Before focusing on the Walbrook Avenue location, the affidavit in support of the Walbrook warrant established various members and activities of "Bullseye," starting with "street-level" transactions before moving to the delivery and management of large packs of narcotics at various residences.  The street-level distribution picture first identified defendant James Meekins as living at 501 Cumberland Avenue.  Ex. E. ¶ 14.  Intercepted communications from September 23 revealed Meekins and defendant Isaiah Timms discussing "jimmy macks"—a term SF1 investigators knew to relate in this context to narcotics packaged for street-level distribution.  *Id.* ¶¶ 16-17.  During a second call between the two, someone could be heard yelling "Bullseye" while Timms told Meekins "we need you".  Meekins responded that he was on his way; this suggested Meekins was going to deliver narcotics to Timms and his associates.  Timms then called Akeem Ross and complained that he was still waiting for Meekins: "I called him and he answered and said he's coming down now but he ain't come to the door yet."  Timms then advised that the person he was waiting for had arrived; at the same time, investigators observed Meekins open the door to 501 Cumberland and Timms enter the building.  *Id.* ¶¶ 18-22.  The affidavit discussed additional communications and observations related to Timms and Meekins engaging in additional drug trafficking.  *Id.* ¶¶ 22-32.  For example, Meekins was seen engaging in hand-to-hand sales outside of his building on September 25.  *Id.* ¶ 26.  Similarly, Timms was identified as being involved in

---

[15] For the reasons stated herein, Mr. Connors lacks standing to challenge some of that underlying evidence, e.g., wire interceptions.  Nonetheless, any challenges he could lodge against warrants authorizing collection of evidence cited in support of the residential warrants would fail for the same reasons others' challenges fail.

a controlled purchase of suspected narcotics during the investigation.  *Id.* at ¶ 16 n.3.  In addition, some of these communications were calls with Ross and referencing co-defendant Jerold Gilliam.  *Id.* ¶¶ 27-32.  On October 7—minutes after Meekins and Ross discussed Gilliam being on his way to Meekins' area—Gilliam arrived at the 501 Cumberland Avenue building, retrieved items from his pocket, and distributed the items to co-defendant Welton Whittington and another individual before meeting Meekins outside the building.  The agents' observations led to their belief that Gilliam provided Meekins a package that, based on the calls with Ross, contained a re-supply of narcotics for Meekins to manage.  Gilliam then left the area in his vehicle, an Infiniti coupe.  *Id.* ¶¶ 27-29.

The affidavit set forth several other calls on October 9 between Ross and "Bullseye" associates, including one residing on Westwood Avenue, and Gilliam's use of his Infiniti to travel to and from various locations including one on Westwood Avenue.  *Id.* ¶¶ 33-42.  The Westwood Avenue residence was where Gilliam delivered and retrieved packages of narcotics and the other Bullseye associate kept the narcotics for retrieval from the street-level sellers.  Also on October 9, Gilliam traveling in his Infiniti, met the individual at the Westwood Avenue house before traveling to the area of Division and Cumberland streets, where he interacted with various "Bullseye" members including Ross.  *Id.* ¶ 38.

Additional facts about the Westwood residence connected Bond to its operations.  Specifically, on October 2, Bond spoke with a male, asking the male to "bring me one." The male then went inside the residence, exited, and walked to meet Bond at near 500 Sanford Place and provide a suspected pack of narcotics.  After that interaction, the male received money from a female and returned to the Westwood Avenue residence.  *Id.* ¶¶ 44-46.

With that and other background establishing the coordinated trafficking activities, the affidavit turned to both Connors and the Walbrook location.  Connors was associated by both visual observations and phone location data with 1946 Walbrook Avenue.  *Id.* ¶¶ 43, 53.  On October 16, Connors and Ross spoke by phone.  Connors said that Gilliam directed him to call Ross.  Ross then asked Connors to meet with the female identified with the Westwood residence and observed meeting Gilliam.  Connors asked "what's the number" and, later, whether Gilliam wanted Connors to provide Ross "all of it"—statements believed to be references to a supply of narcotics.  *Id.* ¶¶ 55-56.  Later that day, Connors and Ross arranged another meeting that investigators suspected involved a narcotics delivery.  *Id.* ¶¶ 57-62.  Shortly after 7:00 a.m. the next day, October 17, video surveillance showed Gilliam's Infiniti arrive in the 1900 block of Walbrook Avenue. Connors left his residence, retrieved two large bags from Gilliam's vehicle, and returned to his residence.  This appeared to be consistent with Connors taking a delivery of narcotics from Gilliam.  *Id.* ¶¶ 64-65.  On October 18, Gilliam left his home around 5:20 a.m., drove his Infiniti to Walbrook Avenue, retrieved an item from under his seat, then walked to 1946 Walbrook Avenue with his hands inside the front pockets of his jacket "as if securing items within it."  Gilliam then entered the Walbrook residence and left in less than three minutes. As Gilliam left the building, Connors briefly emerged from the window before Gilliam drove off.  *Id.* ¶ 65.

Other calls and observations connected items from Connors' residence to the Westwood residence that had investigators associated with "Bullseye" operations.  Just after noon on October 18, Ross asked Connors to go to the Westwood Avenue residence.  With a black shopping bag in hand, Connors rode a bicycle to the Westwood residence.  He carried the bag inside, left moments later, and rode his bike out of the area.  *Id.* ¶¶ 66-69.  Ross and Connors later discussed another meeting, and the two then met at a location where Connors provided Ross a shopping bag.  After

this meeting, Ross delivered the shopping bag to the Westwood residence.  *Id.* ¶¶ 70-72.

Additional facts discussed Gilliam, Ross, and their connections to activities at other locations,

including their apparent residences.  *Id.* ¶¶ 73-86.  One of these connections involved Gilliam

traveling from Ross' residence to Walbrook Avenue, where Gilliam gave Connors a bag and

money that Connors took inside the Walbrook residence.

During the October 30, 2019 execution of a search and seizure warrant at the Westwood

Avenue residence, SF1 agents seized approximately 300 gelcaps—divided into six packs of 50—

of narcotics prepared for sales to end users, a firearm, ammunition, and drug trafficking

paraphernalia.  Ross was present at the home, having arrived about an hour before the search with

a bag.  GPS location data showed that just before arriving, an associate advised Ross that Bond

had a potential customer and that Ross' and Gilliam's vehicles were in the same location,

suggesting a meeting between the two before Ross entered the Westwood Avenue location.

> ### d. *The 1946 Walbrook Avenue warrant issued based on probable cause and, in any event, was not so facially invalid as to cause agents to question its validity.*

In issuing the warrant, then-Magistrate Judge Boardman found probable cause based on

facts establishing a "fair probability" that evidence of drug trafficking would be found at 1946

Walbrook Avenue.  Specifically, the affidavit set forth facts that first established the drug

trafficking conspiracy and the relationship between individuals higher in the hierarchy—Gilliam

and Ross—and those lower in the hierarchy and closer to the end sales—Meekins and Timms.

The facts showed that Meekins appeared to be responsible for supplying Timms with

narcotics when the latter ran low while selling items to end users.  The conclusions were supported

by not only the observations of the individuals' actions but also the substance of their

conversations, which included terms that the affiant stated, based on training and experience as a

DEA agent, were references to drugs or drug trafficking.  When Meekins ran low on his narcotics

supply, Gilliam would provide the same to him.  If there were issues in the supply chain, Timms would advise (and arguably complain to) Ross.  Both Meekins and Timms appeared to be involved in sales to end users.

The facts also showed that Ross coordinated stashing narcotics at other locations, including a residence on Westwood Avenue and Connors' residence on Walbrook Avenue.  The discussions concerning Connors demonstrating his acting at the direction of Ross and/or Gilliam to provide items to Ross, sometimes by way of delivery to the Westwood Avenue residence or elsewhere.  The facts also established Gilliam providing items to Connors at Walbrook Avenue.  Finally, and significantly, the search of the Westwood Avenue location proved the accuracy of investigators' conclusions about Ross and others using that location to store packs of narcotics for further distribution to the lowest levels of the hierarchy.

The affidavit also established the affiant's training and experience supporting the conclusions drawn from these facts.  His training and experience included drug trafficking investigations during which the affiant, among other things, interviewed individuals involved in drug trafficking, examined records and recorded conversations of drug trafficking gparticipants, and observed patterns and actions taken by individuals involved in drug trafficking.  Based on that training and experience, the affiant drew certain conclusions about terminology and actions.  He also stated that drug traffickers often possess packaging materials, records, and other items related to trafficking activities, and that such items would be maintained in the residences and vehicles subject to the warrants.

The affidavit also established a nexus between Connors, suspected criminal activity, and 1946 Walbrook Avenue.  Between location data associated with the phone, phone records, and visual observation of Connors both outside and inside, the affidavit established Connors'

connection to the residence.  It also illustrated Connors' connection to Ross' and Gilliam's activities and the similarities between the role of the 1946 Walbrook Avenue residence and the Westwood Avenue residence where drugs and related items were found less than one month before the warrants issued.

As to certain electronic evidence cited in the affidavit, aside from the intercepted communications, Connors fails to articulate standing to challenge such evidence,[16] let alone how its collection was unlawful.

Although the affiant was not required to make "factual assertions directly linking the items sought" to the subject residence, *see Grossman*, 400 F.3d at 217; *Servance*, 394 F.3d at 230, he did so here.  Therefore, Mr. Connors' motion to suppress must be denied on all grounds.

Assuming, *arguendo*, that the challenged warrant was not supported by probable cause, the affidavit in support still contained "sufficient indicia of probable cause so as not to render reliance on [them] totally unreasonable."  *Clutchette*, 24 F.3d at 582 (applying good faith exception and reversing decision to suppress evidence).  Accordingly, the motion to suppress should be denied pursuant to *Leon*'s good faith doctrine.  *Leon*, 486 U.S. at 913.

2.  The search warrant for 409 Millington Avenue was supported by probable cause.

The search warrant for 409 Millington Avenue found support in an affidavit (the "Dirty Sprite affidavit") different from the one discussing most of the "Bullseye" members and

---

[16] The vehicle location data referenced in the affidavit was collected from vehicles associated with Ross and Gilliam pursuant to warrants issued by the Court.  Connors makes no suggestion that he had any, let alone a reasonable, expectation of privacy impacted by those warrants.  *See United States v. Marquez*, 605 F.3d 604, 609 (8th Cir. 2010) (no standing to challenge use of GPS tracking device on vehicle where defendant "neither owned nor drove the [vehicle] and was only an occasional passenger therein"); *United States v. Broadie*, Crim. No. 3:15CR157-HEH, 2020 WL 3579550, at *8 (E.D. Va. July 1, 2020) (citing *Raskas v. Illinois*, 439 U.S. 128, 133-34 (1978) (suggesting that defendant lacked standing to challenge installation of GPS tracking device on vehicle in which he lacked an ownership or possessory interest).

defendants.  *See* Ex. F.  Magistrate Judge Copperthite authorized search warrants for various locations and person associated with operations connected to the "Dirty Sprite" DTO.  One such person was Charles Bond, who, as noted above, was at times during relevant investigation associated with both organizations discussed here.  Not unlike the "Bullseye" affidavit, the "Dirty Sprite" affidavit presented to Judge Copperthite set forth the location, means, and participants of the "Dirty Sprite" DTO.  The narrative illustrated how Charles Bond and others interacted in person and via telephone calls to carry on a drug trafficking conspiracy.  Also like the "Bullseye" affidavit, the "Dirty Sprite" affidavit connected these individuals to others charged and uncharged in this Court, vehicles used by some of those individuals in carrying on activities at various locations, and electronic surveillance corroborating locations frequented by those involving in the possession and transport of suspected narcotics.  In doing so, the facts presented a fair probability that evidence of the co-conspirators' efforts would be located at, among other places, 409 Millington Avenue.  For this reason, the motion to suppress evidence obtained from this residence should be denied.

In a two-page motion, Mr. Bond maintains that the warrant issued on less than probable cause and that evidence seized from Millington Avenue should be suppressed.  ECF No. 190.

> a. *The "Dirty Sprite" affidavit set forth facts establishing a drug trafficking conspiracy, at least a half dozen participants, and the role of 409 Millington Avenue.*

The "Dirty Sprite" affidavit first established one of the main members of that group, Wesley Clash, and his use of vehicles in connection with the "Dirty Sprite" DTO that operated on a daily basis in the 500 blocks of Cumberland Street and Sanford Place in Baltimore.  Ex. F ¶¶ 14-17.  Clash had a daily routine of traveling from an Owings Mills residence to the DTO's operating area.  *Id.* ¶ 15.  The affidavit then identified 409 Millington Avenue as a residence for Bond and others and, equally important, a location for preparing narcotics marketed as and distributed by

"Dirty Sprite." *Id.* ¶ 18.  Vehicle tracking data showed Clash traveling to the Millington residence at or near times he would discuss on intercepted calls drug trafficking activity.  For example, on August 19, location data for Clash's vehicle showed its location in the 400 block of Millington Avenue.  During that time, Clash stated on the phone that he was "separating the stuff real quick" and asked the other individual on the phone for "Slick's" phone number before saying to "just bring it right here to the basement."  *Id.* ¶ 20.  The investigators identified "Slick" as Dashelle Claridy, who was identified as another resident of 409 Millington Avenue.  *Id.*

On August 26 and 27, Bond and Claridy were observed leaving the residence at various times during the day.  *Id.* ¶ 21.  Clash was also at the residence on August 27.  *Id.* ¶ 21.  Also on August 27, an intercepted call from Bond's phone referenced his attempt to arrange a sale: he sought a bicycle because he had "a play ready to come through for real and he wants a whole jim rod."  *Id.* ¶ 22.  Within 45 minutes, Bond secured a bicycle and was arranging a meeting.  Around tis time, investigators observed him leaving 409 Millington Avenue while carrying a satchel.  As a result, investigating agents concluded that Bond was transporting narcotics taken from the residence to the meeting he arranged by phone.  *Id.*  On September 14, on an intercepted call, Bond and Clash discussed the latter's displeasure with someone else using the basement at 409 Millington Avenue, in the process disrupting whatever Clash had set up in that area.  *Id.* ¶ 24 & n.6.  When Clash advised that he was "just getting down here"—to the 409 Millington basement—Bond advised Clash did not need to rush.  *Id.*

Additional location data confirmed that Clash continued to frequent the residence, with his vehicle traveling to Millington Avenue multiple times per day during a week-long period in October.  *Id.* ¶ 25.  Late in October, investigators observed Claridy exit the residence, remove a bag from her pocket, look around, and then enter the residence with a woman who was waiting

outside.  The woman then left the home about one minute later, leading investigators to suspect this may have been an exchange in connection with the drug trafficking operation.  *Id.* ¶ 26-27. Additional observations in December showed Clash's continued presence at 409 Millington Avenue, with him visiting the residence multiple times per day and sometimes bringing bags to or from the residence.  The frequency and brief duration of these visits by a non-resident who appeared to have previously used the location for preparing narcotics led investigators to suspect additional drug trafficking related activity  *Id.* ¶¶ 28-36.

The "Dirty Sprite" affidavit further discussed how Bond and others participated in the "Dirty Sprite" operation.  The affiant summarized observations related to a residence associated with Clash's motion and a nearby vacant residence, and how some "Dirty Sprite" members would access the rear of those residences in between conducting hand-to-hand sales on a nearby street. *Id.* ¶¶ 37-52.  The usual practice in these cases was that one of the individuals would go to a location in the rear yard to retrieve an item before going back to the street; on some occasions, Clash would, via phone call, direct the individual to specific locations in the rear year.  *See id.* ¶¶ 40, 42-43.  Consistent with this practice, on September 19, 2019, Clash entered the rear yard of his mother's house with another "Dirty Sprite" associate and left a few minutes later.  Two minutes after that, Bond called Clash, who told Bond to "go in the yard, I'm gonna tell you where it's at." When Bond noted his arrival, Clash directed Bond to a bag in a bucket under the porch and noted there were "25 in it."  Bond asks whether other items in the bag were "testers," a term the affiant associated with a blend of controlled substances that may be offered as a sample.  Visual surveillance during the call established that Bond entered the rear of Clash's mother's residence. *Id.* ¶¶ 46-47.  Other facts in the affidavit connected Clash to other individuals who would obtain cutting agents for preparing the controlled substances for sales to end users.  *Id.* ¶¶ 53-62.

b. _The 409 Millington Avenue warrant issued based on probable cause._

In issuing the warrant, Magistrate Judge Copperthite found probable cause based on facts establishing a "fair probability" that evidence of drug trafficking would be found at 409 Millington Avenue.  Specifically, the affidavit set forth facts that established not only the drug trafficking conspiracy and the relationship between Clash and other individuals but also the frequent use of 409 Millington Avenue to prepare controlled substances and some occasional sales using narcotics suspected to be stored at the location.  Beyond Millington Avenue, the facts presented in support of the warrants established the involvement of various individuals including Bond and Claridy— suspected residents of the Millington Avenue residence—in Clash's drug trafficking activities. When combined with the affiant's statements based on training and experience regarding items likely to be kept in residences and elsewhere, these facts establish a sufficient basis for searching 409 Millington Avenue.  Although the affiant was not required to make "factual assertions directly linking the items sought" to the subject residence, *see Grossman*, 400 F.3d at 217; *Servance*, 394 F.3d at 230, he did so here in describing Clash's access to the residence and statements and activities suggesting the presence of narcotics inside.

Alternatively, assuming, *arguendo*, that the challenged warrant was not supported by probable cause, the affidavit in support still contained "sufficient indicia of probable cause so as not to render reliance on [them] totally unreasonable." *Clutchette*, 24 F.3d at 582 (applying good faith exception and reversing decision to suppress evidence).  Accordingly, the motion to suppress should be denied pursuant to *Leon*.  486 U.S. at 913.

For these reasons, Mr. Bond's motion as to 409 Millington Avenue must be denied on all grounds.

3. <u>Ross' motion must be denied because he fails to make the showing required by</u> <u>*Delaware v. Franks* to obtain an evidentiary hearing on the veracity of the warrant.</u>

The basis for searching 2415 W. Lexington Street appears in the same affidavit as that supporting the search of 1946 Walbrook Avenue.  In addition to those facts cited in previous subsection, the affidavit discussed additional indicators that Akeem Ross resided at or otherwise used 2415 W. Lexington Street.  Those facts were enough to create the requisite fair probability that the location would contain contraband or evidence of the crimes alleged in the affidavit, namely, narcotics trafficking.

Mr. Ross seeks a hearing, pursuant to *Delaware v. Franks*, 438 U.S. 154 (1978), to determine the veracity of statements in the affidavit submitted by investigators in this case.  But he fails to make the showing *Franks* demands before such a hearing may occur.  For this reason, Mr. Ross' motion must be denied.

"There is . . . a presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 172.  Therefore, to obtain such a hearing, Mr. Ross must make a "dual showing . . . which incorporates both a subjective and an objective threshold component." *United States v Colkley*, 899 F.2d 297, 300 (4th Cir. 1990).  The first part is the "intentionality prong," which demands "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-56.  The second part—the "materiality prong"—is a showing that the offending information was essential to the probable cause determination. *Id.*  That is, if removal of the challenged information does not eliminate the existence of probable cause, the defendant receives neither a hearing nor relief, i.e., suppression. *See United States v. Moody*, 931 F.3d 366, 374 (4th Cir. 2019) (affirming denial of *Franks* hearing where allegedly material omissions were irrelevant and/or unnecessary to the probable cause determination).  In asserting

such challenges, a defendant's "attack must be more than conclusory": "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 172.

Mr. Ross maintains that "*upon information and belief*," GPS data associated with his phone and vehicle did not actually show his presence "'in the area of [2415 W. Lexington Street] on a nightly basis.'" ECF No. 221 at 2 (emphasis added in first quotation) (second quotation quoting affidavit language). In pressing that this statement was knowingly false, he maintains that he satisfies the second *Franks* element because the statement was necessary to a probable cause determination. On this point, he claims deficiency the "only" five other statements offered to support the conclusion that he resided at 2415 W. Lexington Street. *Id.*

    a. <u>The defendant fails to show that any of the ample facts relevant to 2415 W.<br>Lexington Street, including location data, are false.</u>

The facts supporting the search of 2415 W. Lexington Street included the facts noted in the previous section regarding not only the existence of a drug trafficking conspiracy but Ross' extensive role in facilitating various activities by his co-conspirators. In addition to those facts regarding suspected criminal activity, the affidavit discussed the suspected residences of Ross and other conspirators. Investigators identified 2415 W. Lexington Street as Ross' residence. In paragraphs 84 and 85 of Exhibit E, the affidavit listed the following facts:

- "GPS location data from ROSS's cellular phones and TARGET VEHICLE 1 placed ROSS in the area of [2415 W. Lexington Street] on a nearly nightly basis."
- The use of cell site simulator technology—pursuant to court authorization—to identify phones used by Ross and an associate (UM4000) in the vicinity of this residence.
- A utility bill from Baltimore Gas & Electric reflecting UM4000's number as associated with the account for 2415 W. Lexington Street.

- An intercepted call on November 2, 2019 between Ross and UM4000 where Ross asked about the food that he left in the refrigerator.

- An intercepted call on November 11 where Ross ordered pizza and provided the delivery address as 2415 W. Lexington Street.

- GPS location data associated with Gilliam's vehicle showing his movement from the area of 2415 W. Lexington Street to the aforementioned Walbrook residence where he provided Connors with a bag and money that Connors took into the Walbrook residence.

> b.   *Ross fails to satisfy either* Franks *prong and, in any event, the 2415 W.*
> *Lexington Street warrant issued based on probable cause.*

Ross fails to clear the "high bar" *Franks* imposes "before he may challenge the veracity of a facially valid search warrant affidavit." *Moody*, 931 F.3d at 374. The challenged information is not false. Even if such information were false (it is not) and removed from the affidavit, there is still sufficient basis to connect Ross to 2415 W. Lexington Street based on other evidence, not the least of which are that Ross himself provided the address for a delivery two weeks before the warrants issued. Mr. Ross lodges no other challenges to the facial validity of the warrant beyond the location data statements he believes to be inaccurate. Thus, the failure of either *Franks* prong with respect to the phone and vehicle GPS data ends this challenge and permits the government to offer all evidence from 2415 W. Lexington Street at trial.

The location information referenced in the affidavit is accurate. The longitude and latitude data does show Mr. Ross' frequent presence in the vicinity of 2415 W. Lexington Street. Reading such raw data is no doubt difficult. Exhibit G is a series of maps created by the DEA (after the filing of Ross' motion) to provide an easier to understand illustration of the locations recorded pursuant to the tracking warrants. These demonstrative exhibits show Ross' phone consistently near 2415 W. Lexington Street during the collection period referenced in the affidavit. *See* Ex. G.

Mr. Ross does not offer any affidavit or other evidentiary submission demonstrating the falsity of the affiant's statement. Rather, the challenge rests solely "upon information and

belief."[17]  ECF No. 221 at 2.  Courts regularly deny *Franks* challenges relying on "information

and belief" because "allegation of defense counsel, standing alone, without an offer of proof in the

form of a sworn affidavit of a witness, is not a substantial showing of deliberate falsehood or of

reckless disregard for the truth to warrant a *Franks* hearing."  *United States v. Aguilar*, No. CR 07-

0030 SBA, 2007 WL 4219370, at *10 (N.D. Cal. Nov. 28, 2007); *see also United States v. Dennis*,

2011 WL 3515903, at *9 (D.V.I. Aug. 11, 2011) (collecting cases and declaring "information and

belief" to be "a fatally insufficient basis to merit a *Franks* hearing"); *United States v. Longhi*, 2008

Wl 4426806, at *3 (D. Conn. Sept. 26, 2008) (denying motion because "Longhi's 'on information

and belief' allegations of falsity fall short of the substantial preliminary showing necessary" under

*Franks*).  The failure to present the affirmative evidence *Franks* demands requires denial.

　　　　Equally fatal to the *Franks* motion is the failure to clear the second hurdle.  Even without

the location data—an unwarranted excision—there is still substantial evidence connecting Ross to

2415 W. Lexington Street.  Most notably, Ross connected himself to that location when he ordered

pizza delivered to the residence on November 11, 2019.  In addition, investigators identified

UM4000 as a likely resident based on his phone number being on the electricity account.  On an

intercepted call in November, Ross asks UM4000 about food that he (Ross) left in the refrigerator.

It is appropriate for a magistrate judge to infer that Ross would access a refrigerator where he

resided for at least some period and that he would only ask such a question of someone with access

---

[17] The government acknowledges what may be the reason for this conclusory assertion:  as of the
date of the *Franks* motion, defense counsel did not have the cell phone location data referenced
in the affidavit.  Minutes after filing the motion on October 19, defense counsel brought to
undersigned counsel's attention this absence of location data in discovery.  Soon after,
undersigned counsel reviewed the five discovery productions and determined that the cell phone
location data had been inadvertently omitted when sending other electronic evidence—including
months of intercepted communications and surveillance video as well as phone downloads—to
Mr. Ross' counsel on or about August 5, 2021.  The government acted to remedy the matter,
providing the phone location data within one week of defense counsel identifying the oversight.

to the refrigerator in his residence.  Because UM4000 was likely a resident, based on the utility

bill, and apparently had access to items Ross left in the refrigerator, it was reasonable to conclude

that Ross lived at the same address.  This is especially so in light of Ross' delivery order the

following week.

Therefore, Ross fails to satisfy both *Franks* elements.  Because the failure to satisfy either

is fatal to his request, his motion must be denied.

### 4.  Evidence seized incident to Bond's arrest is lawful and admissible.

Bond moves to suppress evidence obtained at the time of his September 25, 2020 arrest.

Suppression of such evidence would fly in the face of decades of jurisprudence reiterating the

lawfulness of searches incident to arrest.  *E.g.*, *DeFillipo*, 443 U.S. at 35.

After the grand jury returned the indictment in late August 2020, arrest warrants issued for

each defendant.  *See* ECF No. 100 (executed arrest warrant for Charles Bond).  On September 25,

2020 after DEA agents identified Bond near the 500 block of Cumberland Street.  Baltimore Police

Department officers responded to the area and arrested Bond.[18]  During the arrest, the officers

recovered a loaded .380 caliber Beretta pistol from Bond's pants pocket and from elsewhere on

his person, among other things, a cellular phone, empty plastic containers often used to package

individual narcotics doses ("trash cans"), and $300.50 in cash.  Any evidence recovered from his

person or his reach was properly recovered because Bond was named in a valid arrest warrant.  *See*

*Ferebee*, 957 F.3d at 418.  Even if the warrant was determined invalid, *Leon* would apply here

because nothing about the warrant provided reason to suspect its invalidity.  *See* 468 U.S. at 913.

---

[18] DEA agents later learned that Bond had an active violation of probation warrant through the
Baltimore City Sheriff's Office.  Because Bond had to be processed in the state courts first, the
federal arrest warrant was not formally executed until September 30, 2020, *see* ECF No. 100,
after his state appearance concluded.

## III. ROSS' MOTION TO SUPPRESS STATEMENTS SHOULD BE DENIED BECAUSE ALL RELEVANT STATEMENTS WERE POST-*MIRANDA* AND VOLUNTARY.

Akeem Ross moves to suppress statements made to law enforcement. ECF No. 222. The motion does not identify any specific dates where statements were unlawfully elicited, but it does note his presence at the sites of two search warrant executions. Notwithstanding the failure to identify with particularly any statements believed to be inadmissible, the statements to law enforcement were not coerced, involuntary, or otherwise inadmissible. For the reasons stated herein, the Court should deny the motions to suppress statements made by Ross.

### A. Legal Standard

The Fifth Amendment prohibits compelled self-incrimination. U.S. CONST. amend. V. Members of law enforcement must inform individuals who are in custody of their Fifth Amendment rights prior to interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Any individual in police custody and subject to custodial interrogation "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) (quoting *Miranda*, 384 U.S. at 444). Officers may issue *Miranda* warnings orally or in writing. *See, e.g.*, *United States v. Abdi Wali Dire*, 680 F.3d 446, 474 (4th Cir. 2012) (upholding oral warnings). An individual is "in custody" for *Miranda* purposes when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer*, 468 U.S. at 440. "Interrogation" for *Miranda* purposes means "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

In addition to complying with *Miranda*, an individual's statements also must be provided voluntarily.  The applicable test for evaluating the voluntariness of a statement or confession is whether, given the totality of the circumstances, the will of the speaker was "overborne and his capacity for self-determination critically impaired." *United States v. Gray*, 137 F.3d 765, 771 (4th Cir. 1998) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)); *see also Mincey v. Arizona*, 437 U.S. 385, 399 (1978); *Haynes v. Washington*, 373 U.S. 503, 513 (1963).  In making this determination, "coercive police activity is a necessary predicate" to any finding that a confession was not "voluntary" within the meaning of the Due Process Clause of the Constitution. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

In applying these general principles to various factual scenarios, the Fourth Circuit has considered, among other things, factors such as: (1) whether law enforcement officers properly advised the suspect of his right not to make any statements and of his right to have an attorney present; (2) whether the officers inappropriately told the suspect that he was legally obligated to speak with them; (3) whether the officers physically or verbally threatened the suspect; (4) whether the suspect appeared to be cooperative; (5) whether the suspect was misled by the officers into believing that his statements could not be used against him; and (6) whether the officers engaged in any violent behavior during their questioning.  *See United States v. Braxton*, 112 F.3d 777, 781-85 (4th Cir. 1997); *Gray*, 137 F.3d at 771.

### B.   <u>Any statements by Ross occurred subsequent to *Miranda* warnings or were otherwise voluntary and are therefore admissible.</u>

Without identifying any specific statements, Akeem Ross asserts that any statements he made occurred in the absence of *Miranda* warnings.  Ross was present during search warrants

executed on October 30, 2019 and November 21, 2019.[19]  On October 30, members of DEA SF1 participated in a search warrant execution at 1631 Westwood Avenue in Baltimore.[20]  The government anticipates that testimony would demonstrate that after investigators entered the residence—despite Ross' attempts to barricade the front door shut after seeing law enforcement approach—investigators located several individuals in the residence.  Having gathered all present individuals into the living room, one of the DEA SF1 members advised the occupants in accordance with *Miranda*.  Each person acknowledged they understood.  DEA Task Force Officer Ryan Welsh asked Ross and another individual whether they lived at the residence.  Both responded that they were just stopping by.  Later in the search, investigators recovered a black bag (which was inside of a pink bag) that contained rubber banded bundles of cash.  TFO Welsh inquired who the money belonged to.  Ross responded that the money was from dirtbike sales proceeds.  Upon locating keys to a Toyota,[21] TFO Welsh again inquired as to ownership.  Ross claimed the keys.  TFO Welsh asked whether the car was nearby.  After hesitating, Ross said, acknowledged that might be the case.  TFO Welsh then asked whether anything illegal was in the vehicle.  Ross advised that it contained money from dirtbike sales.  TFO Welsh sought consent to search the vehicle; Ross consented because it contained only money.

All of these statements are admissible.  *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (a statement following a *Miranda* advisement will "rare[ly] be deemed involuntary").  At no time prior to TFO Welsh's inquiries did Ross request counsel or invoke his right to silence.

---

[19] Ross was not present at the November 21 search of his 2415 W. Lexington Street residence.

[20] This warrant issued from the District Court of Maryland for Baltimore City on October 29, 2019.

[21] Earlier in the investigation, investigators observed Ross using a blue Toyota Solara.  *See* Ex. C at ¶¶ 74, 85, 86, 149.

The agents neither physically nor verbally threatened Ross, nor did they engage in any violent behavior during questioning.  *Cf. Braxton*, 112 F.3d at 781-85.  And they did not tell Ross he was obligated to speak; to the contrary, some of the inquiries to which Ross replied were general questions not directed at any specific individual.  Because Ross' detention during the search was lawful and his statements were made voluntarily and post-*Miranda*, the statements were voluntary and should not be suppressed.[22]

On November 21, DEA agents executed the search warrant at 1946 Walbrook Avenue, Connors' residence.  Ross was present.  The government anticipates testimony will establish that all occupants of the location—some living on different levels of the residence—were secured outside the residence.  DEA Task Force Officer John Jendrek advised the occupants of their *Miranda* rights.  All acknowledged these rights either verbally or non-verbally.  Investigators then searched the second-floor bedroom and bathroom where Connors and Ross were observed just before the agents' entry and, later, Ross' Toyota (also pursuant to a warrant).  After seizing a firearm and hundreds of grams of controlled substances from the residence, as well as several individual doses of suspected cocaine from the Toyota, agents arrested Ross and Connors.

Undersigned counsel is not aware at this time that Ross made any statements to law enforcement on this date.  But to the extent any such statements are identified, they should be admitted so long as they occurred after TFO Jendrek's advisement.

---

[22] Notwithstanding the absence of any challenge to it, the search of Ross' Toyota is lawful due to his lawfully obtained consent.  *See, e.g.*, *Schneckloth*, 412 U.S. at 219.

## IV.    THE MOTION TO SEVER SHOULD BE DENIED BECAUSE MARQUESE WARD IS PROPERLY JOINED WITH THE OTHER DEFENDANTS.

Defendant Marquese Ward moves for severance of the defendants' trials.[23]  He suggests the possibility that defenses presented in this case will require jurors to disbelieve a co-defendant to believe another or, alternatively, that a co-defendant may present exculpatory testimony as to him.  ECF No. 186.

It is well-settled that federal courts prefer joint trials of defendants who are indicted together, absent "special circumstances."  *United States v. Brugman*, 655 F.2d 540, 542 (4th Cir. 1981); *Zafiro v. United States*, 506 U.S. 534, 538 (1993).  Two or more defendants may be charged in a single indictment, even if all defendants are not charged in each count of the indictment, "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. Crim. R. P. 8(b).  When a party is properly joined under Rule 8 and is seeking severance, that party must establish that "*actual prejudice* would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal."  *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995) (citations and internal quotations omitted) (emphasis added).  Speculative allegations as to possible prejudice are not enough to establish a basis for severance.  *See United States v. Becker*, 585 F.2d 703, 707 (4th Cir. 1978).

Severance is a matter within the trial court's discretion.  *United States v. West*, 877 F.2d 281, 287 (4th Cir. 1989).  Courts have the ability to sever properly joined trials "or provide any other relief that justice requires" "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment

---

[23] This Response assumes that all motions to adopt encompass the severance motion.

about guilt or innocence." Fed. Crim. R. P. 14(a); *Zafiro*, 506 U.S. at 539.  Even where actual prejudice is shown, severance is not mandatory; the trial court wields discretion how to best tailor appropriate relief.  *Zafiro*, 506 U.S. at 538.  Claims of potential prejudice are generally addressed through limiting instructions rather than severance, which creates an unnecessary burden and inefficiency for the court, the government, and the witnesses by requiring the presentation of the same case on multiple occasions.  *See Zafiro*, 506 U.S. at 539; *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.

### A.   The defendants are properly joined pursuant to Federal Rule of Criminal Procedure 8(b).

All defendants are charged with participating in a conspiracy to distribute and possess with the intent to 400 grams or more of a mixture or substance containing a detectable amount of fentanyl.  Additionally, Ward is charged with possession of a firearm by a prohibited person.  No other defendant is charged with the same possession; Ross and Connors are charged with firearm possession on a different date.  Various other defendants are charged with discrete instances of possession with intent to distribute controlled substances.  All the individual counts, however, including Ward's, effectively are overt acts in furtherance of the conspiracy.  As such, all the counts of the Indictment are part of and arise from the conspiracy in which all the defendants are charged.

As an initial matter, severance should be summarily denied as to any defendant asserting this position by adoption of an argument specific to the evidence against Ward.  Stripped of those Ward-specific grounds, the adoption motions by Bond, Connors, Conway, and Ross are left with general assertions as to why severance is warranted.  Notwithstanding this absence of any specific factual assertions for severance, the adoption attempts should be denied on the basis asserted below regarding Ward's arguments.

Being alleged as members in the same drug trafficking conspiracy (Count One, in which all the defendants are charged), the moving defendants are properly joined and should be tried together. *Reavis*, 48 F.3d at 767; *see also United States v. Ford*, 88 F.3d 1350, 1361 (4th Cir. 1996) (efficiency and judicial economy support joint trials of co-conspirators). Furthermore, although Ward is not charged in another other count and is the sole defendant in his firearm count, Rule 8(b) does not require that each co-defendant be charged with every offense. *Brugman*, 655 F.2d at 543. "Participation" as used in Rule 8(b)'s joinder analysis "does not require 'participation' in each transaction of the series." *Id.* Indeed, a case involving a conspiracy is precisely the type of case in which co-conspirators should be tried together, given that much of the government's evidence will pertain to all defendants and their activities related to the drug trafficking conspiracy. *See Zafiro,* 506 U.S. at 537–38; *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999). In this case, all defendants are charged together in Count One. Therefore, they are properly joined under Rule 8(b).

**B.** **Severance is not warranted given the admissibility of evidence against co-defendants in a single trial and the absence of any concrete showing that a co-defendant is willing to offer exculpatory testimony as to Ward.**

Ward is not entitled to severance simply because evidence against one defendant is stronger than the evidence against another. *See United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012); *United States v. Zelaya*, 908 F.3d 920, 928-929 (4th Cir. 2018); *Akinkoye*, 185 F.3d at 197. Nor can severance be justified because some evidence admitted against one defendant may not be necessarily applicable to another defendant, a circumstance that Rule 8(b) already assumes may arise. *Brugman*, 655 F.2d at 543.

In this case, the United States will introduce evidence at trial of all defendants' involvement in the conspiracy alleged in Count One. Although some defendants are not charged with discrete possession with intent to distribute offenses, the nature of the charges are not drastically different

in that Count One relates to an overarching drug trafficking operation motivating all defendants' alleged activities, whether those be drug possession or firearm possession in locations associated with drug trafficking.   Ward is charged with a firearm seized during the October 30, 2019 search of 1631 Westwood Avenue, where investigators also seized narcotics.  Ross was present at the house and discussed the search with Ward on a phone call after the search.  (Similarly, Ross and Connors are charged with a firearm seized during a search of Connors' residence, where investigators also located narcotics and drug packaging materials.)  Therefore, this is not the type of case where multiple defendants "are tried in a complex case…with markedly different degrees of culpability" that would require severance because of heightened prejudice to the defendants. *Zafiro*, 506 U.S. at 539.  Put another way, for the drug conspiracy and individual charges related to drug trafficking, the United States will present the same evidence to establish the drug trafficking operation alleged in the Indictment, its participants, its territories, its methods and means, and foreseeable firearm possession related to those operations.  If severance were granted, the United States would essentially be required to present the same evidence at separate trials. Doing so would create repetitive trials, an unnecessary waste of judicial resources.

Here, Ward also speculates that severance may be required on the basis that a co-defendant will offer exculpatory testimony.  *See Reavis*, 48 F.3d at 767-68.  The Fourth Circuit applies a four-part test that Ward bears the burden to satisfy: "(1) a bona fide need for the testimony of his co-defendant; (2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege; (3) the substance of his co-defendant's testimony; and (4) the exculpatory nature and effect of such testimony." *Id.* at 767 (quoting *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983)).  Ward's burden requires a "reasonable probability . . . that the proffered testimony would, in fact materialize and that the co-defendant would have waived his

Fifth Amendment right." *Parodi*, 703 F.2d at 779 (internal quotation marks and citation omitted). Severance on this basis is particularly uncommon. *Reavis*, 48 F.3d at 767 ("A defendant's attempt to have her trial severed from that of a co-defendant is far less likely to succeed when the request is based on the asserted need for a co-defendant's testimony."); *see also United States v. Little*, 175 F.3d 1017 (4th Cir. Mar. 23, 1999) (unpublished table op.) ("We reject this argument, which is generally not a winning one.").

In essence, the test requires Ward to "demonstrate that [his] co-defendant's testimony would be more than a vague and conclusory statement . . . of purely cumulative or negligible weight or probative value." *Reavis*, 48 F.3d at 767 (quoting *Parodi*, 703 F.2d at 779) (internal quotation marks omitted). Such showing "must be sufficiently definite so that the trial court can evaluate the exculpatory nature and effect of the co-defendant's potential testimony." *Id.* at 768 (quoting *Parodi*, 703 F.2d at 779) (internal quotation marks omitted). If Ward cannot present "any specific information [a co-defendant] could [] suppl[y] affecting the outcome of [Ward's] trial," not to mention the actual willingness offer such testimony,[24] the motion must fail. *Id.*; *see also United States v. Shuford*, 454 F.2d 772, 779 (4th Cir. 1971) ("[O]ur approach . . . does not mandate a severance in every situation where one defendant desires the testimony of another.").

On the face of his motion, Ward offers no facts rising to the reasonable probability standard employed since *Shuford*. *See* 454 F.2d at 778; *cf. United States v. Adkins*, 2011 WL 1885617, at *1 (S.D.W.V. May 18, 2011) (potential co-conspirator testimony that they lacked knowledge of

---

[24] On the willingness question, courts in this circuit routinely reject conditional agreements to testify, e.g., an agreement to testify only if the co-defendants' trials occur in a certain order. *See Reavis*, 48 F.3d at 767; *accord United States v. Spinelli*, 352 F.3d 48, 56 (2d Cir. 2003) ("[S]uch conditional offers smack of bad faith." (internal quotation marks and citation omitted)).

the defendant or a business relationship among them "would not necessarily exculpate the defendant"). The record before the Court compels denial of this motion.[25]

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the defendants' motions.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:    _____/s/_____

Charles Austin
Assistant United States Attorneys
36 South Charles St., 4th Floor
Baltimore, Maryland 21201
Tel.: (410) 209-4800

---

[25] Even if Ward later meets the four-part *Parodi/Reavis* test, the Court then considers five additional factors to determine whether severance is warranted. *Parodi*, 703 F.2d at 779.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of November 2021, a copy of the foregoing

Response was electronically filed with notice to all counsel of record.


_____/s/_____
Charles Austin
Assistant United States Attorney